IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
2005 DEC 27  PM 2: 34

WEST___          ____ COURT
___ ___          ____ TEXAS

BY ____

| | | |
|---|---|---|
| BETSEY AUBREY, STEVE AUBREY, ERIKA BOEHM, WILLIAM B. BROWN, RICHARD CROWLEY, CLARICE DYKEMA, ROBERT EMERSON, M. RUSSELL GREGORY, KEITH HARRIS, BARBARA HEARST, HEINEMANN FAMILY TRUST, BYRON HILL, BOBBY R. INMAN, WILLIAM JONES, PETER CHASE NEUMANN, MELVIN SOLOMON, VODICKA FAMILY TRUST, BRIAN VODICKA, GARY VODICKA, HELEN VODICKA, ALTON WHITE,<br>　　　　Plaintiffs<br><br>v.<br><br>DOBI MEDICAL INTERNATIONAL, INC., PHILLIP THOMAS, ROBERT MACHINIST, WILLIAM LI, MICHAEL JORGENSEN, FRANK PUTHOFF, ROBERT SOHVAL, DAVID CLARKE, STERLING FINANCIAL INVESTMENT GROUP, INC., HARRY DATYS, VERUS INTERNATIONAL GROUP LIMITED,<br>　　　　Defendants | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO.:<br><br>**A05CA1070SS** |

## COMPLAINT

### I. NATURE OF THE ACTION

1.　　This is a securities fraud suit brought by investors in DOBI Medical International, Inc. DOBI claimed to have a viable medical device that was an innovation in detecting breast cancer. However, DOBI does not have a viable machine, never had a viable machine, and has no prospect of having a viable machine any time soon. Because it lacked a viable machine to entice investments, DOBI resorted to fraudulent schemes to raise money. In



these endeavors, several of its officers and directors, a merchant bank, a brokerage firm, and a broker joined DOBI. The investors seek relief under state and federal law.

2.        This case arises out of illegal "pump and dump" stock fraud schemes engineered by Defendants. Defendants hired so-called "stock analysts" to tout the company's stock by means of misrepresentations regarding the status of regulatory approval of the company's product, the prospects for domestic and international sales, and the existence of alleged multi-million dollar international sales that were, in fact, not sales at all. The Defendants caused an increase in trading volume, sold restricted stock to unsuspecting victims, and then dumped millions of shares of stock at an inflated price. The victims, Plaintiffs, were left with stock in a valueless company whose only product is a medical system that does not perform as represented and which is not approved for sale as a medical device and does not have sales in domestic or international markets.

3.        In late 2003, DOBI Medical was a struggling medical device company that had a digital breast imaging scanner, the "ComfortScan System," which it promoted as an alternative to mammography for detecting breast cancer. The primary theory on which the device was to operate was the detection of changes in the vascular system around tumors caused by breast cancer. Because DOBI was financially unstable, in mid-to-late 2003, a DOBI board member, Defendant David Clarke, introduced DOBI to a merchant bank, Defendant Verus International ("Verus"). Verus offered to help capitalize DOBI by initially purchasing approximately $5 million in stock initially, with more to come as certain goals were achieved. In exchange for the Defendant's influx of money into DOBI, Verus required that DOBI reverse merge with a shell company called Lions Gate, a company that was largely owned by Verus. By way of the reverse

merger, Verus and the "Friends of Verus," collectively, came to own a substantial portion of DOBI stock that was not subject to trading restrictions.

4.      Defendants made sweeping false representations regarding the effectiveness of the product. For example, in 2004, prior to the completion of the *initial* testing, Defendants represented to Plaintiff Brian Vodicka that the product outperformed traditional mammograms in the detection of breast cancer. Defendants represented in a power point presentation on June 22, 2004 that the system had a 96% "sensitivity" rating and an 86% "specificity" rating. These representations had no basis in fact. In connection with DOBI's summer 2004 private placement, these representations were also made to other Plaintiffs with the intent that Plaintiffs rely on such representations in deciding to invest in DOBI. These representations are directly attributable to named individual Defendants, Thomas, Sohval, Jorgenson, Li, and Datys.

5.      Defendants also misrepresented facts regarding the market for their product. Defendants emphasized that the product was already authorized for commercial distribution abroad. DOBI also misleadingly touted a "sale" of $5.6 million in product to a company in India. The representations regarding this "sale" were misleading because the company knew – and did not disclose – that the alleged sale was a "wash" sale that would generate little or no revenue for the company. The company was in fact obligated to refund or rebate most of the purchase price to the buyer.

6.      Further, Defendants misrepresented the market for the stock they were selling. The DOBI and Sterling Defendants indicated directly and indirectly to Plaintiffs that the company's stock was on the threshold of being listed on the American Stock Exchange, where they represented it would trade at a price in excess of $6-8 per share. Defendants did not disclose when they were making these representations that DOBI had entered into a fraudulent

"pump and dump" scheme with Verus, that the majority of the company's common shares were controlled by an affiliated group (Verus and the "Friends of Verus") that intended to sell the stock as quickly as possible, or that DOBI was on the verge of bankruptcy and lacked the financial wherewithal to qualify for listing on the American Stock Exchange and had no immediate or likely prospects to raise the necessary capital to qualify for listing.

7.      In connection with the sale of the shares to Verus, DOBI agreed to a "pump and dump" stock fraud scheme.  The Complaint details the evidence of this scheme – amongst other things, it refers to and quotes from an e-mail sent by DOBI Board Member Webb Turner in which he acknowledged that DOBI's Board had entered into the 'pump and dump' scheme "with our eyes wide open in Oct-Dec, 2003."

8.      A "pump and dump" scheme is one where the owners of a company's stock create artificial demand for the stock and artificially inflate the stock's trading volume while surreptitiously selling their personal shares at the inflated price, leaving the purchasers owning stock in a valueless company.  The scheme was wildly successful – immediately after the Private Placement was completed in July 2004 (through which all Plaintiffs purchased DOBI stock), Verus and the Friends of Verus dumped millions of shares of stock they had purchased for approximately $0.00025 per share.   The stock was dumped at $1.40 per share, netting a staggering profit in excess of 5,600%.

9.      Many other communications evidence the existence of the scheme.  For example, an October 8, 2004 memorandum from CEO Philip Thomas to the Chairman of the DOBI Board (Robert Machinist) indicates that Verus was pressuring the company "at a time when only shares Verus controlled were available to sell in the market."  A Verus Board  member Andy Merkatz wrote in an October 19, 2004, e-mail to DOBI Chairman Bob Machinist, that the "Strategic

Initiatives [promotional] campaign . . . did succeed in creating liquidity in the stock as average [stock sales] volume has increased from 2,000 shares per day to over 50,000 shares per day." As the memo from Thomas referenced above indicates, this increase in sales volume occurred at a time when only Verus held shares that were available for public sale; hence, the increase worked solely to benefit Verus and the "Friends of Verus" and operated to the detriment of all other holders of DOBI securities. Thus, in exchange for agreeing to the pump and dump, DOBI received millions of dollars from Verus and was able to sell its stock at an artificially inflated price to Plaintiffs via the summer 2004 private placement.

10.     The "pump and dump" and stock fraud scheme required Defendants to use third-party intermediaries to make representations to the market about DOBI's stock. Verus created a captive public relations firm known as "Strategic Initiatives." DOBI paid $750,000 to Strategic Initiatives as a condition of the reverse merger and investment of funds by Verus. Keith Ebert, CEO of Lions Gate, the company with which DOBI reverse merged, owned Strategic Initiatives. Individual DOBI Defendants Thomas, Li, Jorgenson, Puthoff, and Clarke were aware of and supported Strategic Initiatives' efforts to pump DOBI stock.

11.     Strategic Initiatives in turn paid a stock analyst, Rising Star Stocks, to publish a newsletter containing misrepresentations regarding DOBI stock. This newsletter touted the alleged sale of forty units to a company in India (the fraudulent $5.6 million sale described above), but did not disclose that most or all of the purchase price was to be rebated or refunded to the buyer. The newsletter also stated that the product could be sold commercially in the European Union countries by virtue of the "CE Mark," without disclosing that the product could not in fact be sold in those countries until it applied for and obtained approval by the countries' respective governments. Strategic Initiatives also paid another stock analyst, Spelman Research,

to publish an article touting the stock. The Spelman article emphasized the India sale without disclosing that the sale was a "wash" because of the rebates and refunds that were required.

12.     In addition, DOBI employed Sterling Financial to conduct the summer 2004 private placement. On behalf of DOBI, Sterling issued a Private Placement Memorandum touting the company, which contained numerous misrepresentations. Harry Datys, a broker employed by Sterling to handle the sale of DOBI's stock to the public, made numerous misrepresentations to investors and potential investors, including Plaintiffs. Further, the DOBI and Sterling Defendants utilized Plaintiff Brian Vodicka, Plaintiff Barbara Hearst, and Peter Schiff as conduits to convey false information regarding DOBI to the investing public. Vodicka, Schiff, and Hearst innocently repeated many of the misrepresentations made to them to others, including other Plaintiffs who invested in DOBI stock.

13.     The "pump and dump" operation was a success. In addition to generating millions for DOBI through the private placement and the sale to Verus, as well as significant commissions for Sterling, the scheme resulted in Verus and the Friends of Verus extracting exorbitant profits by virtue of their "dumping" the DOBI stock in the days immediately following completion of the private placement. Shortly after the newsletters and analysts reports were issued (and paid for by Strategic Initiatives), sales volume in DOBI shares underwent a rapid increase, climbing from a volume of approximately 2,000 shares per day to as high as 50,000 shares per day. Verus and its affiliated "Friends of Verus" sold 1,000,000 shares in a block sale on or about August 24, 2004.

14.     As a result of their manipulation of the market, Verus and the friends of Verus earned a return in excess of 5,600% on their initial investment, while Plaintiffs unknowingly purchased stock in a company that had no product and no meaningful prospect of becoming a

successful, operating company.  Since the inception of the pump-and-dump scheme, the price of DOBI stock rose to a high of almost $3 per share, at which point Verus began dumping its shares on the "bulletin board" market for sale of stock not listed on major exchanges.  After completion of the scheme, and with revelation that the product does not perform (as represented to Plaintiffs), the price of the stock has fallen to approximately $.20 per share.

## II.  PARTIES

### A.  Plaintiffs

15.     Richard Aubrey, deceased, was an investor and a citizen of Texas.  Betsey Aubrey is Executor of the Estate of Richard Aubrey, and she is a Texas citizen.

16.     Steve Aubrey is an individual citizen of Texas.

17.     Erika Boehm is an individual citizen of Florida.

18.     William B. (Bill) Brown is an individual citizen of California.

19.     Richard Crowley is an individual citizen of California.

20.     Clarice Dykema is an individual citizen of Illinois.

21.     Robert Emerson is an individual citizen of Texas.

22.     M. Russell Gregory is an individual citizen of Texas.

23.     Keith Harris is an individual citizen of Pennsylvania.

24.     Barbara Hearst is an individual citizen of Suffolk County, New York.

25.     The Heinemann Family Trust is a trust organized under the laws of Arizona, with its principal place of business in Pima County, Arizona.  Ken Heinemann is the Trustee.

26.     Byron Hill is an individual citizen of New York.

27.     Bobby R. Inman is an individual citizen of Texas.

28.     William Jones is an individual citizen of Texas.

29.     Peter Neumann is an individual citizen of Nevada.

30.     Melvin Solomon is an individual citizen of South Carolina.

31.     The Vodicka Family Trust is a trust organized under the laws of Texas and has its

principal place of business in Dallas County, Texas.  Gary Vodicka is trustee.

32.     Brian Vodicka is an individual citizen of Texas.

33.     Gary Vodicka is an individual citizen of Texas.

34.     Helen Vodicka is an individual citizen of Texas.

35.     Alton White is an individual citizen of Texas.

**B.     Defendants**

36.     DOBI Medical International, Inc. is a Delaware corporation with its principal

place of business at 1200 MacArthur Boulevard, Mahwah, New Jersey, 07430.

37.     Phillip C. Thomas is an individual who was President and Chief Executive

Officer of DOBI, and is a citizen of New Jersey.

38.     Robert B. Machinist is an individual citizen of New York and is a director and

chairman of the board of directors of DOBI.

39.     William Li is an individual and citizen of Massachusetts who is a director of

DOBI and a member of DOBI's scientific advisory board.

40.     Michael R. Jorgensen is an individual citizen of New Jersey and was executive

vice-president and chief financial officer of DOBI.

41.     Frank M. Puthoff is an individual citizen of New Jersey and is general counsel

and secretary of DOBI.

42.     Robert Sohval is an individual resident of New Jersey and is vice-president of

research and development for DOBI.

43.     David Clarke is an individual citizen of Florida and is a director of DOBI and is a member of Sterling's Advisory Board.

44.     Sterling Financial Investment Group, Inc. (hereinafter "Sterling" or "Sterling Financial") is a corporation incorporated under the laws of Florida and has its principal place of business in Florida.

45.     Harry Datys is an individual citizen of New York.  At all relevant times he was a broker acting as an agent of Sterling and DOBI.

46.     Verus International Group Limited (hereinafter "Verus") is a merchant bank with its principal place of business in New York at 20 West 55th Street, 12th Floor, New York, New York 10019.

### III. JURISDICTION & VENUE

47.     This action arises in part under Sections 10(b) and 20 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j (b) and 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5.  Therefore, this action arises in part under the laws of the United States and involves federal questions.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1332, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  This Court has supplemental jurisdiction under 28 U.S.C § 1367 over plaintiffs' claims under state law, because those claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy, under Article III of the United States Constitution.

48.     Venue is proper in this district pursuant to 15 U.S.C. § 78aa, because numerous acts and transactions that constitute the violations occurred here.  In addition, venue is proper under 28 U.S.C. § 1391(b)(2), because a substantial part of the events and omission giving rise to the claims occurred here.

49.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV. DEFENDANTS' FRAUDULENT SCHEMES

### A.     Overview

50.     This case involves stock manipulation by the Defendants based on misrepresentations of existing facts to pump the stock and let DOBI sell stock to unsuspecting victims at inflated prices, and to allow Verus and its affiliates to dump the stock and receive an artificially inflated price.

51.     DOBI has a device called the "ComfortScan" System, which is intended to detect breast cancer.  The machine does not perform accurately or reliably and so it is not marketable as a diagnostic tool.  After exhausting its initial funding, DOBI needed money, but telling the truth about the machine would hardly spur investment.  So DOBI set out, with the other Defendants, to raise money by defrauding investors.  DOBI and the others engaged in a manipulative "pump and dump" scheme to deceive the entire market, and made fraudulent misrepresentations directly to new investors like the Plaintiffs.

52.     Plaintiffs were victimized by Defendants' two related schemes.  First, Defendants conspired to artificially inflate ("pump") the trading volume and price of DOBI securities by widely disseminating misrepresentations, half-truths, and distortions.   Second, Defendants enticed Plaintiffs to purchase DOBI securities by misrepresenting the machine, the status of regulatory approval of the machine, sales of the machine, and the company's financial condition. The schemes worked together to let DOBI get higher prices from the investors, because the

market price was artificially inflated.  After the price was successfully inflated, and after the investors were lured in, certain Defendants and their friends were allowed to sell (or "dump") DOBI stock at a huge profit.  This massive dumping caused the price to plummet, leaving the Plaintiffs with practically worthless stock in a company whose product does not work.

53.     DOBI, the Defendant officers and directors, and Verus knew what they were getting into.  In an e-mail to the board, DOBI director, Webb Turner, called this scheme "*the 'pump and dump' undertaking that we entered into with our eyes wide open Oct-Dec 2003.*"  Defendants may have had their eyes wide open, but they hid the truth from the Plaintiffs.

**B.     The "pump and dump" scheme**

54.     In late 2003, DOBI Medical was a struggling medical device company that had a digital breast imaging scanner, the ComfortScan System, which it promoted as an alternative to mammography for detecting breast cancer.  Because DOBI was financially unstable, in mid to late 2003, a DOBI board member, David Clarke, introduced DOBI to a merchant bank, Verus International.  Verus offered to help capitalize DOBI by purchasing approximately $5 million in stock, with more to come as DOBI achieved certain goals.  In exchange for Verus's cash infusion, Verus required that DOBI merge with a public shell company called Lions Gate Investment Limited.  After the reverse merger, the company would bear DOBI's name.

55.     DOBI received the $5 million in funding from Verus in December 2003.  The parties also set up a private placement for mid-2004 where DOBI could raise another $5.1 million by selling restricted shares that could not be sold during the time when Verus could sell or "dump" its shares.  Verus and its affiliates agreed to invest more money in December 2004 if DOBI met certain milestones.

56.     Significantly, Verus and its affiliates could purchase DOBI stock for $1.00 per share in December 2003 and December 2004.  In between, the investors could purchase their stock at $2.00 per share.

57.     After the reverse merger of DOBI with Lions Gate, the only freely-traded shares (the "shell shares"), which comprised the "public float" of the company, were those issued to the Lions Gate shareholders.  These shares were 8,461,538 out of 37,537,712.  These shareholders paid only $0.00025 per share.  These shares were not restricted, so they could be sold at any time.  The remainder of DOBI's shares was subject to severe restrictions.

58.     Verus and an affiliated group called "Friends of Verus" formed an undisclosed control group that controlled at least 4,600,000 of the 8,461,538 shell shares in DOBI during 2004.  Verus and its affiliates intentionally and fraudulently concealed their ownership of the shares and failed to file ownership reports required by the Securities Exchange Act of 1934, in order to manipulate the securities market by the "pump and dump" scheme.

59.     The effect of these deals was concealed.  None of the purchasers in this placement nor any holders of the public float filed Schedule 13D reports in 2003 disclosing that they owned 5% of the shares.

60.     Verus managed to take back some of the $5 million it invested in DOBI by requiring that DOBI execute an advisory agreement with a Verus affiliate called Verus Support Systems, Inc. ("VSS").  DOBI agreed to pay VSS $17,500 for twenty-four months – i.e., $420,000.  This agreement was signed by DOBI's President/CEO Phillip Thomas and by Andrew Merkatz on behalf of Verus.

61.     To execute the "pump and dump" and stock fraud schemes DOBI and Verus used third-party intermediaries to make misrepresentations to the market about DOBI's stock.  For the

scheme to work, DOBI and Verus needed to promote the stock so the price would rise and stay high while DOBI lured in other investors and while Verus dumped its stock. This pumping would allow Verus and its affiliates to profit by selling their unrestricted shares. This pumping also would allow DOBI to entice investors into the private placement, because the offering price would look attractive compared to the inflated open market price.

62.     Verus created a captive public relations firm called Strategic Initiative, Inc., for the sole purpose of conducting a large-scale promotional campaign. The promotional campaign aimed to convince unsuspecting investors that DOBI was a financially sound, well-managed company with a working cancer detection system, and that the purchase of DOBI securities would yield a high return.

63.     Keith Ebert, CEO of Lions Gate, the company with which DOBI merged, owned Strategic Initiatives. DOBI paid $750,000 to Strategic Initiatives as a condition of the merger. DOBI also had to issue warrants to Strategic Initiatives for 250,000 more shares for "investor and public relations services." Defendants Thomas, Li, Jorgenson, Puthoff, and Clarke were aware of and supported the Strategic Initiatives efforts to pump DOBI's stock.

64.     DOBI and the Defendant officers and directors aided the fraudulent "pumping" by issuing misleading press releases. In one, dated June 8, 2004, DOBI boasted of its progress in moving toward FDA approval. Phillip Thomas stated that DOBI was "on plan" and "meeting all of its business objectives." Thomas also was listed as the person to contact for more information.

65.     On June 22, 2004, DOBI issued a misleading press release making it appear that ComfortScan system was commercially marketable, by reporting an agreement to sell forty units in India. Quoting its Senior Vice President of Sales & Marketing, Denis O'Connor, DOBI

announced, "Our ComfortScan System is now ready for its international commercial launch and we have increasing interest within a number of countries for this product."  CEO Thomas was quoted, "We continue to be on plan and are meeting all our business objectives to achieve the commercialization of the ComfortScan system."

66.    DOBI and Verus began disseminating through paid intermediaries numerous false and misleading statements about the machine.  In July 2004, Strategic Initiatives paid Rising Star Stocks approximately half a million dollars to publish and distribute a report with many false and exaggerated representations, including:

    (a)    *A revolutionary medical imaging device is about to hit the market, and when it does, early investors could hit the jackpot!*

    (b)    *This new, noninvasive technology in breast cancer detection could earn you profits of 167% or more!*

    (c)    *<u>It's no surprise then that DOBI already has its first international sales agreement in place to sell 40 of these systems in the next 18 months, and based on an expected unit price of $140,000, should generate a whopping $5.6 million in unit sales for the company!</u>*

    (d)    *In May 2004, DOBI received the CE Mark and European Community ISO 9001:2000 certifications . . . [.]  For countries in the European Union, devices bearing a CE Mark can be commercially distributed.  As a result, DOBI is planning to ship the first ComfortScan Systems to select countries in the fourth quarter of 2004.*

    (e)    *Based on DOBI's anticipated list price of approximately $140,000 per unit, <u>the potential worldwide market for the ComfortScan System – as an adjunct to mammography alone – is estimated to be between $4.9 billion and $6.3 billion!</u>*

    (f)    *"And with no debt to its name and $25 million in investment money, the company could break even by the end of 2005."*

67.    The Rising Star Stocks report was published during the time that many of the Plaintiffs invested or were considering investing.  This promotional newsletter gave unrealistic credibility to the impression created by DOBI and Verus that DOBI had a working system and

was a viable company. The reports artificially boosted the stock price and trading volume, making DOBI's stock appear more attractive.

68.    In August 2004, to keep the price of DOBI stock inflated as Verus and its Friends began dumping large volumes of DOBI stock, Strategic Initiatives paid Spelman Research $23,500 to publish and distribute another article with more false statements, to create additional demand for DOBI stock. The Spelman report contained the following misleading information:

(a)    Clinical tests for Module 5 – the final clinical trial required before FDA approval – would start in the third quarter of 2004.

(b)    DOBI had already received international orders for fifty units.

(c)    DOBI's system had a "comparative advantage over mammography."

69.    DOBI, with the approval of its defendant officers and directors, paid for these false and misleading materials, and DOBI was the source of the false and misleading information. These false materials were published on behalf of DOBI to make its stock price rise and to increase purchases of its stock.

70.    The Plaintiffs who invested by way of DOBI's summer 2004 private placement paid $2.00 per share for DOBI's stock. The investment appeared particularly attractive given the numerous and egregious misrepresentations made to them about the company and its product. Further, while the Plaintiffs were being solicited to participate in the private placement in June and July 2004, the stock was trading above $2.00 per share, so it appeared to the Plaintiffs that they were purchasing their DOBI stock at a discount. In fact, when the private placement closed in July 2004, DOBI stock was trading at $2.30 per share.

71.    Unfortunately for the Plaintiffs, the fraudulent scam to manipulate the market for DOBI's stock was a great success. Trading volume dramatically increased. It went from 29,000 shares in June, to 103,000 in July, and sky rocketed to 1,600,000 shares in August and almost

1,000,000 shares in September.  In August 2004, Verus and its affiliates dumped at least one million shares at $1.40 per share, which they had purchased for $0.00025 per share as part of the reverse merger – a gain of 5,600%.  This "dump" at $1.40 per share undermined the market as the stock was selling at the time for approximately $2.20 per share.

72.    As a result of the "dump" the price fell, causing harm to the Plaintiffs.  Within two months the price had fallen to $1.02 per share.  Further, without a viable product the stock continued to plummet and as of the month this suit is filed, December 2005, the price was $0.21 per share.

73.    The DOBI defendants and Verus knowingly engaged in a concerted effort to push a steady stream of false and misleading information about the device, to keep the stock price high.  After the private placement memoranda, reports, and press releases were published, Andy Merkatz of Verus urged Thomas to keep up the effort.  In a September 9, 2004, e-mail, Merkatz responded to the concern that further promotion of the device through a "proactive investor relations and communications program . . . may cause artificial price inflation." Merkatz encouraged Thomas to continue with regular positive information about DOBI to keep the price high.  Merkatz wrote:  "As you can see, without buyers it does not take much supply of stock, and certainly a lot less than 8.4 million shares, for our stock price to come under significant pressure."

74.    Merkatz hinted at the legal risk they were taking by promoting a product that did not work, by saying to Thomas:

> When we first did the transaction with you in December, one of the reasons we were comfortable proceeding was your public company experience in the small-cap/microcap arena. *While we appreciate the fact that we are all operating in a rigorous regulatory business environment, I am confident in your ability to navigate this environment and the related legal advice you are receiving* and to demonstrate the outward leadership required of a successful public company

CEO.  I am happy that you will be working in close combination with Bob Machinist on the IR effort since Bob's experience in this area is invaluable but I still maintain that successful shareholder communications begins and ends with you as the CEO.

(Emphasis added).

C.     **Misrepresentations to Plaintiff Brian Vodicka Commencing in February 2004**

75.     Brian Vodicka first heard of DOBI in February 2004 from a friend, Byron Hill. Mr. Hill's employer was engaged to perform marketing consulting services regarding DOBI's product.  Brian Vodicka was given a copy of a power point presentation shown by DOBI's CEO Phillip Thomas at a Las Vegas National Investment Bankers Association meeting that month.  In the presentation DOBI and Thomas said:

(a)     The ComfortScan System would revolutionize the digital breast imaging industry.

(b)     The device could detect the beginning of breast cancer through angiogenesis.

(c)     DOBI had studies completed evidencing that the device was able to detect false positives in mammography and was able to detect cancer earlier than mammography.

(d)     DOBI was trying to raise money to build more systems and to market the device internationally.

(e)     DOBI had received orders for fifty-six units.

(f)     The founders had invested $5 million of their own money.

76.     Brian Vodicka also got a copy of DOBI's 2003 annual report.

77.     Relying on representations by DOBI and Phillip Thomas, in early March 2004 Brian Vodicka bought 50,000 shares of DOBI stock for $2.77 to $2.83 per share in the open market.  He unwittingly bought some of the overpriced "shell shares" sold by Verus.

78.     Brian Vodicka decided to contact DOBI to learn more.  DOBI's Chief Financial

Officer, Mike Jorgensen, told Brian Vodicka:

(a)     The company was coming out of the development stage.

(b)     The company had begun to market its ComfortScan System for use in the diagnosis of cancer.

(c)     The company was conducting a private placement at $2.00 per share at a time when the stock was trading around $2.75 per share.

(d)     The company was raising funds to build inventory and to build its cash position to be listed on the American Stock Exchange (AMEX).

(e)     DOBI's monthly expenses were $400,000.

79.     Mike Jorgensen referred Brian Vodicka to Harry Datys, a broker with Sterling

Financial Investment Group, Inc., for more information.  Harry Datys said:

(a)     The ComfortScan Medical Imaging System worked.

(b)     The machine was currently being marketed in international markets.

(c)     The system was able to diagnose tumors better than mammography.

(d)     The system had a CE mark, which in Europe was the equivalent of FDA approval in the United States, and which allowed DOBI to freely, commercially market the machine throughout the European Union.

(e)     DOBI's monthly expenses were $400,000.

(f)     Proceeds from this private placement, together with $3 million coming in December from another placement, would adequately fund the company's operating expenses for premarket approval submission of the final clinical test before approval by the FDA.

(g)     The $400,000 monthly expenses included all the costs of the FDA clinical trial.

(h)     The proceeds of this private placement would be used to build inventory for sales.

(i)     DOBI had money escrowed specifically for international sales.

(j)      The proceeds of the July offering were going to be used shore up DOBI's cash position to allow it to go on the AMEX in August 2004.

(k)      DOBI was right on track on its timetable for submitting its premarket approval to FDA.

(l)      Although DOBI officially stated that the system was to be used in conjunction with mammography in the detection of breast cancer, DOBI intended the system to be an independent screening device, and DOBI marketed the system as an adjunct system to prevent General Electric, a manufacturer of mammography equipment, from pushing DOBI out of the breast cancer detection market.

80.      Around May 7, 2004, DOBI sent Brian Vodicka two copies of the Private Placement Memorandum in the mail.  DOBI later mailed two more copies.  Brian Vodicka kept one copy and gave others to friends and family members.

81.      Brian Vodicka reviewed the Private Placement Memorandum and relied on the following representations, which he later discovered were false and misleading:

(a)      Page 3 attempted to portray the ComfortScan System as medically acceptable by stating that DOBI is the angiogenesis leader in the biomedical market.

(b)      DOBI represented that the machine's "sensitivity" (the ability to refer accurately patients for biopsy with malignant lesion) was 93%, and its "specificity" (the ability to correctly identify benign lesions) was 67%. (Page 4).

(c)      Proceeds from the July placement would be used to promote international sales and would be used to build inventory for sales.  (Page 9).

(d)      The CE mark allowed the machine to be commercially marketed throughout the European Union.  Page 20 states, *"Devices that comply with the requirements of a relevant directive will be entitled to bear a CE Marking, indicating that the device conforms to the essential requirements of the applicable directive and accordingly can be commercially distributed throughout the European Union."*

(e)      The company was seeking FDA approval and projected clinical trials at twelve to fifteen sites by December 2004.

82.     Relying on the representations by DOBI, Phillip Thomas, Mike Jorgensen, and Harry Datys, and after reviewing the private placement memorandum, Brian Vodicka bought more DOBI shares through DOBI's private placement.

83.     On June 17, 2004, Brian Vodicka visited DOBI headquarters in Mahwah, N.J., to learn more about the company.  He was given an investor presentation by Mike Jorgensen, Harry Datys, Denis O'Connor, Robert Sohval, and Frank Puthoff.  The presentation included several representations he later learned were false:

(a)     The machine worked.

(b)     The machine was currently marketed for sale in international markets.

(c)     The machine's ability to diagnose tumors represented a major medical advancement in technology over mammography.

(d)     The machine had achieved a 96% "sensitivity" (measure of number of patients with cancer who test positive) and 86% "specificity" (number of patients who do not have cancer and test negative).

(e)     The machine covered the entire breast, creating a competitive advantage over IMDS (a competitor).

(f)     The CE mark allowed DOBI to freely, commercially market the machine throughout the European Union.

(g)     The monthly expenses were $400,000.

(h)     Proceeds from the July placement, together with $3 million coming in December from another placement, would more than adequately fund the company's operating expenses for premarket approval submission of the final module 5 for FDA approval.

(i)     The proceeds of the July placement would be used to strengthen the company's cash position to allow it to be listed on the AMEX.

(j)     A substantial portion of the funds earmarked for Investor Relations/Public Relations – $750,000 – was going to be used to market the system in international markets.   (Harry Datys said this after the officers stepped out.)

(k)     A study coming out of Paris in September 2004 would show the system compared favorably with MRI.

**(1.)    Misrepresentations to Plaintiff Barbara Hearst as well.**

84.    Before he returned home, Brian Vodicka was joined by Ruben Johnson and Barbara Willis Hearst.  Hearst is a well known supporter of organizations that focus on women's health issues.  On June 22, 2004, they returned to DOBI's headquarters and saw the same investor presentation Brian Vodicka had received.  Representations were made by DOBI officers Phillip Thomas, Mike Jorgensen, Frank Puthoff, Robert Sohval, and Denis O'Connor.  Also attending and making representations was Harry Datys of Sterling Financial Investment Group, Inc.

85.    Phillip Thomas, Mike Jorgensen, Robert Sohval, and Denis O'Connor represented orally and by power point:

(a)    The ComfortScan System worked.

(b)    The ComfortScan System was currently marketed for sale in international market.

(c)    The ComfortScan System's ability to detect tumors in a woman's breast represented a major medical advancement in technology over current mammography.

(d)    The most recent study of the system showed it achieved 96% sensitivity and 86% specificity.

(e)    The ComfortScan System had the ability to detect tumors in a woman's breast that far exceeded the accuracy of conventional mammography – it could detect a tumor at the 1 - 1½ year stage of development, compared to the mammogram's detection of a tumor at five years.

(f)    The proceeds of the private placement offering would be used to build inventory for sales of the ComfortScan System.

(g)    The CE mark allowed DOBI to commercially market the system throughout the European Union.

(h)    The CE mark was the equivalent of FDA approval in Europe.

86.    Phillip Thomas, Mike Jorgensen and Harry Datys represented:

(a)    DOBI's monthly expenses were $400,000.

(b)    Proceeds from the July placement, together with $3 million coming in December from another placement, would more than adequately fund the company's operating expenses for premarket approval submission of the final module 5 for FDA approval.

(c)    The proceeds from the private placement offering were simply "insurance" to guarantee that DOBI would make it through the FDA approval process.

(d)    Proceeds from the private placement offering were going to be used to strengthen the company's cash position to allow it to go on the American Stock Exchange.

87.    Mike Jorgensen orally misrepresented that a study from Paris, France would show the ComfortScan System compared favorably with MRI.

88.    Phillip Thomas, Mike Jorgensen, Denis O'Connor, and Harry Datys misrepresented:

(a)    Clinical trials on the system were to begin on September 1, 2004.

(b)    The same Defendants showed a map of the globe showing 8-12 sites where the machine had ongoing clinical studies. Brian Vodicka relied on this as proof that the machine was up and running and ready to go.

(c)    This map supported the impression that FDA approval was likely and imminent, and the funding would be ample to take company through the remainder of the FDA approval cycle.

89.    Phillip Thomas and Harry Datys orally misrepresented that DOBI was "on track" to meet its FDA approval timetable.

90.    Phillip Thomas misrepresented:

(a)    Although DOBI officially maintained that the ComfortScan System was to be used in conjunction with mammography in the detection of breast cancer, the true purpose of the system was to be an independent screening device. Phillip Thomas explained that DOBI marketed the system as an adjunct system to prevent General Electric, a manufacturer of

mammography equipment, from pushing DOBI out of the breast cancer detection market.

(b)     DOBI only needed $3 million out of this fundraising to meet company expenses through all the clinical tests needed before submission to the FDA for approval.

(c)     Any extra was just "insurance" if something unexpected came up, and if they raised over $3 million he was going to hire patent firm to attack their own patents to make sure they were valid.

(d)     Extra money would show they had sufficient funds to survive a year and take the "going concern" note out of the accountant's report, which would allow DOBI to go on the AMEX with no problem. [Mike Jorgensen also made this representation.]

91.     After the DOBI officers excused themselves from June 22 presentation, Harry Datys represented Vodicka, Hearst and Johnson:  (a) DOBI stock was going to be listed on the AMEX in the near future; and (b) DOBI had $750,000 escrowed specifically to market the ComfortScan System in international markets.

92.     Other representations made at the June 22 meeting included:

(a)     The vast portion of the funds earmarked for Investor Relations/Public Relations – $750,000 – was going to be used to market the system in international markets.

(b)     The ComfortScan System covered the entire breast and thus had a competitive advantage over its competitor, Imaging Diagnostic Systems.

(c)     DOBI entered into an agreement on June 22, 2004, to sell forty machines at $125,000 to $140,000 each to UTL, a company in India.

93.     Also on June 22, 2004, DOBI issued a misleading press release making it appear that the ComfortScan System was commercially marketable, by reporting an agreement to sell forty units in India.   DOBI announced, "Our ComfortScan System is now ready for its international commercial launch and we have increasing interest within a number of countries for this product."  Phillip Thomas, Mike Jorgensen, Denis O'Connor, and Harry Datys provided this

press release to Barbara Hearst and Brian Vodicka and explained that DOBI had its first international multi-million dollar sale for $5.6 million.

94.     Relying on all of these oral and written representations, Brian Vodicka invested more money in DOBI through the private placement[1] and Barbara Hearst invested in DOBI via the private placement as well.  Further, Hearst was so impressed with the presentation and with the opportunity to further the fight against breast cancer that she offered to lend her efforts to assist DOBI's public relations campaign.

95.     DOBI CEO Thomas and Sterling broker Harry Datys were particularly excited about Ms. Hearst's investment, because she has publishing contacts and is a well-known supporter of organizations focusing on women's health issues.  Datys offered her a position on the board of directors and represented that he was authorized by Thomas to do so.  She declined, but did agree to serve on the Advisory Board.  Ms. Hearst offered to assist DOBI in any way possible to publicize the ComfortScan system.  DOBI was so excited about this that they issued a press release July 7, 2004, announcing the creation of a Business Advisory Committee with Ms. Hearst as a member and detailing her relation to the Hearst publishing empire.  The press release also included a quote from Barbara Hearst praising DOBI, and a quote from Thomas that group would be invaluable to aid efforts to grow and improve.[2]

96.     On or about June 24, 2004, Barbara Hearst also spoke with Thomas about placing someone on the DOBI board of directors, who could assure her that the company was being

---

[1]     Later in June, Brian Vodicka transferred part of this investment to the Vodicka Family Trust.

[2]     Ms. Hearst later worked with Thomas and DOBI's public relations firm, Lazaar Partners, to assist in preparing a "bullet sheet" for Thomas to use in contacting magazine editors.  Ms. Hearst arranged for Thomas to forward his presentation to the editor of Cosmopolitan International, Helen Gurley Brown.

operated in a proper manner, in accordance with all the rules and regulations prescribed for public companies. Ms. Hearst wanted to make sure things were operated "on the up and up."

97.     Thomas agreed to create an additional seat on the board and agreed with Ms. Hearst that Brian Vodicka would be a good candidate because of his significant personal investment. On June 25, 2004, while Brian Vodicka was in Austin, Texas, Thomas offered him a position on DOBI's Board of Directors. Thomas said the appointment would follow shortly, but it was deferred for three months.

**D.      Entanglement with Third Parties:  The Sterling and DOBI Defendants used Brian Vodicka, Peter Schiff, Barbara Hearst, and Others as Conduits to Convey False Information to Advance the Summer 2004 Private Placement.**

98.     The DOBI and Sterling Defendants used third parties, Brian Vodicka, Barbara Hearst, and Peter Schiff, as conduits, making false and misleading statements to them with the intent that Mr. Vodicka, Ms. Hearst and Mr. Schiff would repeat those statements to others in order to induce others into investing in DOBI.

99.     Unknowingly armed with a slew of misrepresentations (as detailed in the previous section), Brian Vodicka and Barbara Hearst were encouraged by the DOBI and Sterling Defendants to notify their friends and family of the very limited opportunity to participate in DOBI's private placement. The private placement was scheduled to close in July (unbeknownst to Brian Vodicka, Barbara Hearst and the other Plaintiffs, so that Verus and Friends could ramp up their "dumping"). Within days of the June 22nd meeting, DOBI Defendants Phil Thomas and Mike Jorgensen federal-expressed a large, oversized box to Brian Vodicka containing multiple copies of DOBI's private placement memorandum and various marketing materials for distribution to prospective investors. Jorgensen and Thomas encouraged Brian Vodicka to

distribute those materials and to repeat to prospective investors the representations that had been made to him.

100.    Between June 24, 2004, and July 4, 2004, Brian Vodicka and Barbara Hearst repeated the representations made to them to friends and acquaintances.  Brian Vodicka contacted Plaintiffs Steve Aubrey, Robert Emerson, Russell Gregory, William Jones, Gary Vodicka, Helen Vodicka, Alton White, Keith Harris, Bobby R. Inman, and others, and repeated the misrepresentations that had been made to him by the DOBI Defendants and Sterling Defendants.  Brian Vodicka also distributed the private placement memorandum and marketing materials to some of these Plaintiffs.

101.    Within approximately one week Brian Vodicka had distributed all of the DOBI investment solicitation materials previously sent to him.  Jorgensen federal-expressed a second large box containing more of the same materials to Brian Vodicka.  DOBI's general counsel, Frank Puthoff, then called Brian Vodicka and told him to distribute just the marketing materials and to refer prospective investors to Sterling and specifically, Datys, to get a copy of the private placement memorandum.

102.    During this June/July time period, DOBI Defendants Thomas and Jorgensen and Sterling Defendant Datys were in virtually constant contact with Brian Vodicka.  They wanted to be constantly updated concerning his efforts to spread the word about DOBI's private placement and encouraged him to keep soliciting prospective investors.  Datys worked with Brian Vodicka to locate qualified investors for DOBI.  Brian Vodicka was praised by the DOBI Defendants and Datys for his efforts enlisting these new investors.  Datys even offered to pay Brian Vodicka for investors that he brought to DOBI, an offer that Brian Vodicka declined.

103.     As reflected above, the DOBI Defendants and Sterling Defendants used Brian Vodicka as a conduit to convey false information regarding DOBI to the investing public. The DOBI and Sterling Defendants purposefully entangled themselves with Brian Vodicka by disseminating false and misleading information to him with the expectation and intent that he would repeat the information to others, including Plaintiffs Steve Aubrey, Richard Aubrey, Robert Emerson, Russell Gregory, William Jones, Bobby Inman, Erika Boehm, Richard Crowley, Alton White, Gary Vodicka, and Helen Vodicka. The DOBI and Sterling Defendants purposefully entangled themselves with Brian Vodicka in order to defraud these Plaintiffs.

104.     In the summer of 2004, DOBI persuaded a broker, Peter Schiff, the President of Euro Pacific Capital, to recommend investment in DOBI to his clients, including Plaintiffs Ken Heinemann (acting on behalf of the Heinemann Family Trust), Melvin Solomon, Peter Chase Neumann, Clarice Dykema, and others. Prior to recommending DOBI, Schiff had extensive conversations with DOBI's CFO, Mike Jorgensen and board member, Dr. Will Li. Schiff subsequently learned that Jorgensen and Li made representations to him that were false and misleading and were material. According to Schiff, "Had Mr. Jorgensen given me an honest assessment of the risk, the planned use of proceeds, future capital requirements, the effectiveness of the products, the lack of revenue visibility, and the true speculative stage of development once the company actually operated, I would not have recommended DOBI to any of my clients." The following is a summary of the false and misleading misrepresentations made by Jorgensen and Li to Schiff (and in part, how Schiff now knows such statements to be false or misleading):

1.     The ComfortScan system was represented as a product that worked. I was led to believe that it was highly effective, and that it could identify tumors that were far too small to be detected by mammograms. I was persuaded that the ComfortScan would ultimately supplant mammography as a screening process for breast cancer. In the SB-2 filed with the SEC on April 25, 2005, DOBI stated that in January 2005, "in connection with the

development of version 2.0 of our ComfortScan system, internal testing by non-physician employees raised concerns about scan acceptance rates, repeatability performance, and the overall diagnostic accuracy.  Pg. 18 of SB-2 filed April 25, 2005.

2.      That several units had been sold, and far more sales were forthcoming in the immediate future.  However in the SB-2 filed with the SBC on April 25, 2005 DOBI states that they have released 'our first production level version 1.0 ComfortScan system as an investigational device.'

3.      Mr. Jorgensen represented that the ComfortScan system had already been approved in many countries as evidenced by its CE Mark, which was offered as proof that the product could be sold to the European Union. However, it seems that the CE Mark is only the first step in selling the system in the European Union and not the final step.

4.      Mr. Jorgensen represented that European sales would be sufficient to sustain profitability until FDA approval of the product in the United States.  However, according to the SB-2 filed on April 25, 2005, DOBI has "generated insignificant ComfortScan system revenues to date."

5.      Mr. Jorgensen represented that some of the proceeds of the offering would be used to obtain a listing on the American Stock Exchange.  Also, DOBI would create greater awareness of the revolutionary, break-through technology among Wall Street firms, and the medical community, and this new awareness would create increased institutional and private investor demand for the securities which would translate into substantial earnings per share growth. However, as can be seen on the OTC Bulletin Board the value of DOBI securities has fallen substantially…

6.      That the offering in question would "fully fund" DOBI's business' plan and that this would be the final capital raise.  As can be seen from DOBI's SB-2 filed with the SEC on April 25, 2005 they very quickly went out and had to raise more capital to stay afloat.

7.      The PPM that I recommended at the two dollar per share exercise price reflected the valuation of a company that was no longer in the speculative phase, but which was entering a more mature, cash flow positive business. It was represented to me that the proceeds for this offering were only needed to pay for the manufacture of units which were currently sold, or ordered shortly.  Mr. Jorgensen represented the offering as merely bridge-financing, to allow the company to build more units, in advance of receiving payment.  The business was to be self-sustaining, as cash flow from sales would fund the operating costs of the business.  According to DOBI's SB-2 filed with the SEC on April 25, 2005, DOBI stated "we have generated insignificant ComfortScan system revenues to date, and

therefore can draw no conclusions regarding the seasonability of our business. Page 18 of SB-2 dated April 25, 2005.[3]

105.     DOBI employed Defendant Sterling as its broker and agent to underwrite the private placement.   Sterling employed or retained Harry Datys and Peter Schiff to make misrepresentations directly to the Plaintiffs in an effort to induce them to invest in DOBI.  Peter Schiff became a sub-broker of Sterling Financial in order to sell DOBI stock.  All Plaintiffs purchased the DOBI securities at issue in this lawsuit from Sterling Financial.[4]  Schiff, similar to Brian Vodicka and Barbara Hearst, was a conduit used by DOBI and Sterling Financial to inject misrepresentations about DOBI into the market.  The DOBI and Sterling Defendants knew that Schiff would repeat misrepresentations about DOBI to potential investors and intended for those investors to rely on such representations.  DOBI and Sterling purposefully entangled themselves with Schiff in order to defraud Plaintiffs Heinemann Family Trust, Peter Chase Neumann, Melvin Solomon, Clarice Dykema, Bill Brown, and others.

### E.     The June/July 2004 DOBI Private Placement: Misrepresentations made to and relied upon by the remaining Plaintiffs.

#### (1)     Steve Aubrey

106.     In June or July of 2004, Harry Datys, acting within the course and scope of his position as a stockbroker with Defendant Sterling Financial (the managing underwriter for both of DOBI's private placements), made various representations to Steve Aubrey while Steve Aubrey was in Austin, Texas.  Datys represented to Steve Aubrey that the DOBI ComfortScan System worked and was better than a mammography and cost less.  Datys said that the system

---

[3]     These quotes were taken from the Affidavit of Peter Schiff executed on June 16, 2005, in connection with the suit filed by DOBI against Brian Vodicka in the Supreme Court of New York, County of New York, Index #601348/05.

[4]     Brian Vodicka also purchased other shares prior to the private placement.

was in its fifth and final FDA approval stage and that approval was imminent. Datys further represented that 40 machines had been sold in India at $140,000 per machine resulting in a $5.6 million sale. Datys additionally stated that the system had obtained the CE Mark in Europe and that that Mark was the equivalent of FDA approval in the United States. He also stated that DOBI would be listed on the American Stock Exchange in August of 2004 at a price between $5.00 and $6.00 per share. Datys assured Steve Aubrey that the private placement would raise enough money to carry the company through the final FDA approval. Datys also stated that there would be no need to raise any further funds after the private placement closed, due to the amount of money raised in the offering and to the sale of forty machines to India. Relying on the representations by Datys, Steve Aubrey invested in DOBI. As described herein, the representations were false and misleading. Aubrey also reasonably relied on the private placement memorandum, public filings, and press releases in making his investment decision. All of these communications contained material misrepresentations as discussed in much more detail.

### (2)    Dr. Richard Crowley

107.    In June and July 2004, Datys made various representations about DOBI to Richard Crowley while Crowley was in Burbank, California. Datys represented that DOBI's ComfortScan System was a major breakthrough in helping to detect breast cancer because it detected tumors sooner, smaller, and without any radiation or harm to women. Datys represented to Crowley that the system worked and was currently being sold in other countries, but it could not be sold in the United States until it passed its fifth and final stage of the FDA approval process. Datys represented that the system worked and that DOBI had sold forty systems in India. Datys stated that in time the system would outpace mammography.

108.    Datys further represented that the money being raised would put DOBI on the map and would help DOBI become listed on the American Stock Exchange.  Datys represented to Crowley that DOBI's share price would begin at $6.00 per share when the company would first be listed on the American Stock Exchange on August 26 or 27, 2004.  Datys stated that he could "immediately flip" Crowley out for $6.00 a share, and he guaranteed the investment numerous times in expressions such as this deal is a "slam dunk," "a done deal," "as good as gold," "money in the bank," and a "can't lose proposition."

109.    Datys also represented to Crowley that that DOBI's system had a huge cost advantage because it was very cheap, around $20,000, and would sell for $140,000.  Datys further stated that the price of DOBI's closest competitor was $370,000 per machine and this competitor's machine, which was not equal in quality to the ComfortScan, was having problems getting FDA approval.  Datys stated that DOBI was right on track to get FDA approval, and he represented that Dr. Will Li was an FDA consultant and would be on the final FDA panel that would shortly provide FDA approval of the machine.  Datys represented the system was currently being sold in international markets and, as proof, referred Crowley to a recent press release announcing that a company in India was buying numerous systems.  Datys also stated that the Indian company was going to invest $1 million in DOBI through the same private placement being offered to Crowley, creating an incentive for that company to actively promote the system in India.  Relying on the representations made by Datys, Crowley invested in DOBI. As described herein the misrepresentations were false and misleading.  Crowley also reasonably relied on the private placement memorandum, public filings, press releases, and DOBI's website in making his investment decision.  All of these communications contained material misrepresentations as discussed in much more detail.

(3)     **Robert Emerson**

110.     In June or July of 2004, relying on the representations made to him and discussed above, Brian Vodicka repeated various representations to Robert Emerson while Emerson was in Austin, Texas.  Brian Vodicka repeated to Emerson that the DOBI ComfortScan System was the latest thing in breast cancer detection and that it worked and was better than mammography. Brian Vodicka also repeated to Emerson that DOBI was in the process of obtaining FDA approval and that such approval would be obtained shortly.  Brian Vodicka repeated that the device was going to be used in Europe as well as the United States.  Relying on the information repeated by Brian Vodicka, Emerson contacted Defendant Sterling Financial and invested in DOBI.  The representations were false and misleading.  Emerson also reasonably relied on the private placement memorandum, public filings, and press releases in making his investment decision.  All of these communications contained material misrepresentations as discussed in much more detail.

(4)     **M. Russell Gregory**

111.     In June or July of 2004, relying on the representations made to him and discussed above, Brian Vodicka repeated various representations to Russell Gregory while Gregory was in Austin, Texas.  Brian Vodicka repeated to Gregory that the DOBI ComfortScan System was the latest thing in breast cancer detection and that it worked and was better than mammography. Brian Vodicka also repeated to Gregory that DOBI was in the process of obtaining FDA approval and that such approval would be obtained shortly.  Brian Vodicka repeated that the system had already received its European Union approval and was being used in Europe. Relying on the information repeated to Gregory by Brian Vodicka, Gregory contacted Sterling Financial and invested in DOBI.  The representations were false and misleading. Gregory also

reasonably relied on the private placement memorandum, public filings, and press releases in making his investment decision. All of these materials contained material misrepresentations as discussed in much more detail.

(5)     **Dr. William Jones**

112.     In late June or early July 2004, Brian Vodicka, relying on the representations made to him and discussed above, repeated various representations, and Datys made various representations, to William Jones while Jones was in Austin, Texas. Brian Vodicka repeated to Jones that the breast cancer detection system created by DOBI worked and had very high sensitivity and specificity rates. Brian Vodicka repeated representations – later found to be misrepresentations – that he had been told, including: physicians could use the system in their offices in routine screening, DOBI was in the process of obtaining FDA approval for the ComfortScan System; and that FDA approval would be obtained shortly. Brian Vodicka referred Jones to Datys at Sterling Financial. Datys provided Jones with a packet of material including the private placement memorandum. Datys told Jones that there was a very short window of opportunity to invest and that Jones should wire the investment funds to him immediately, rather than mail them. Jones initially offered to mail a check, but Datys was very insistent that the funds needed to be wired immediately. Datys then referred Jones to his assistant, who walked him through the process of wiring his funds. Datys was very enthusiastic about the company, representing the investment as a "chip shot" and offering no caveats concerning any potential downsides to the investment. Datys told Jones that investors could sell the securities as soon as the company went public. Datys also indicated that system had been tested in Europe and that the system had been sold in both Europe and India. Relying on the information repeated to Jones by Brian Vodicka and represented by Datys, Jones invested in DOBI. The representations were

false and misleading.  Jones also reasonably relied on the private placement memorandum, public filings, press releases, and DOBI's website in making his investment decision.  All of these communications contained material misrepresentations as discussed in much more detail.

    **(6)**    **Gary Vodicka**

    113.    In June or July of 2004, Brian Vodicka, relying on the representations made to him and discussed above, repeated various representations, and Datys also made various representations, to his brother, Gary Vodicka, while Gary Vodicka was in Dallas, Texas.  Brian Vodicka repeated to Gary Vodicka that the breast cancer detection machine DOBI had developed worked and was better than mammography.  Brian Vodicka also repeated to Gary Vodicka that DOBI's ComfortScan System had received its CE Mark and was therefore approved for use in the European Union.  Brian Vodicka further repeated that DOBI was in its last phase of FDA approval and that final approval would be complete shortly.  After speaking with Brian Vodicka, Gary Vodicka called Datys to discuss investing in DOBI.  Datys represented to Gary Vodicka that DOBI had $120 to $140 million in overseas contracts for its system and that the system had been sold in three countries.  Datys stated that the DOBI machine was better than mammography and that it had its CE Mark, which meant it had approval to be sold in Europe.  Datys also represented to Gary Vodicka that DOBI was on the fast track for FDA approval and that final approval would be granted shortly.   Datys also represented that DOBI was well funded and financially secure.  Datys claimed that DOBI had over a $100 million in cash and that money was being raised through the private placement to fund worldwide distribution of the machine in the near future, as FDA approval was imminent.  Relying upon the information relayed to Gary Vodicka by Brian Vodicka and Datys, Gary Vodicka invested in DOBI.  The representations were false and misleading.  Gary Vodicka also reasonably relied on the private placement

memorandum, public filings, press releases, and DOBI's website in making his investment decision.  All of these communications contained material misrepresentations as discussed in much more detail.

### (7)    Helen Vodicka

114.    In June or July of 2004, Brain Vodicka, relying on the representations made to him and discussed herein, repeated these representations to his mother, Helen Vodicka, while Helen Vodicka was in Dallas, Texas.  Brian Vodicka repeated to Helen Vodicka that the breast cancer detection machine that DOBI had developed worked and was better than mammography and was cheaper, lighter, and more convenient to move than mammography machines, so that less-developed countries could afford to buy the systems.  Brian Vodicka further repeated to Helen Vodicka that DOBI's ComfortScan System could detect cancer earlier than mammography and that it had passed four of the five stages in the FDA approval process and that approval would be obtained shortly.  Brian Vodicka also repeated to Helen Vodicka that ComfortScan Systems had been sold in India and other countries and that the machine had been used and worked.  Brian Vodicka repeated to Helen Vodicka that the proceeds would be used for further development of the DOBI product.  Based upon of the information repeated to Helen Vodicka by Brian Vodicka, Helen Vodicka invested in DOBI.  The representations were false and misleading.  Helen Vodicka also reasonably relied on the private placement memorandum and DOBI's website in making her investment decision.  All of these materials contained material misrepresentations as discussed in much more detail.

### (8)    Alton White

115.    In June or July of 2004, Brian Vodicka, relying on the representations made to him and discussed above, repeated various representations to Alton White, while White was in

Austin, Texas.  Brian Vodicka repeated to White that DOBI had a breast cancer detection device called the ComfortScan System. Brian Vodicka repeated to White that the ComfortScan System was a working device and that it was better than mammography. Sterling advised White that he needed to invest within a week, or he would miss out on the opportunity.  Relying upon the information repeated to him by Brian Vodicka and represented to him by Sterling, White invested in DOBI.   The representations were false and misleading.  White also reasonably relied on the private placement memorandum in making his investment decision.   The private placement memorandum contained material misrepresentations as discussed in detail.

### (9)    Dr. Richard Aubrey/Betsy Aubrey

116.    Richard Aubrey invested in DOBI in June or July of 2004. The investment was made with community property funds he owned with his wife, Betsy Aubrey.  Subsequently, Dr. Aubrey passed away.  Betsy Aubrey is currently the rightful owner of the DOBI stock purchased by Dr. Aubrey, including the rights associated with that stock and its purchase.  In June or July of 2004, Datys made various representations to Dr. Aubrey, while Dr. Aubrey was in Dallas, Texas.  Datys represented to Dr. Aubrey that the DOBI ComfortScan System worked and was better than mammography and cost less.  Datys said that the system was in its fifth and final FDA approval stage and that approval would be obtained shortly and that it had sales under contract in India.  Datys additionally stated that the system had obtained the CE Mark in Europe and that mark was the equivalent to FDA approval in the United States.   He also stated that DOBI would be listed on the American Stock Exchange in August of 2004 and that it would have a share price of between $5.00 and $6.00.   Datys represented that the private placement would raise enough money to carry the company through the final FDA approval.  He also stated that there would be no need to raise any further funds after the private placement closed due to

the amount of money raised in the offering and to the sale of forty machines in India. Relying upon the information represented to him by Datys, Dr. Aubrey invested in DOBI. The representations were false and misleading. Dr. Aubrey also reasonably relied on the private placement memorandum, public filings, press releases, and DOBI's website in making his investment decision. All of these communications contained material misrepresentations as discussed in much more detail.

**(10)    Keith Harris**

117.    Shortly before July 31, 2004, Datys made various representations to Keith Harris, while Harris was in Yardley, Pennsylvania. Datys said an investment in DOBI would double by the end of 2004. Datys represented to Harris that DOBI had a machine called ComfortScan, which worked and was very accurate for detecting breast cancer and was better than any other breast cancer detection machine out there. Datys stated the ComfortScan was in final stage of the FDA approval process and that approval would be obtained shortly. Datys told Harris that DOBI had many investors and that the ComfortScan would be sold internationally. Datys represented to Harris that this investment opportunity would be closing very shortly and, therefore, Harris should invest immediately. Relying on the representations by Datys, Harris invested in DOBI. The representations were false and misleading.

**(11)    Bobby R. Inman**

118.    In June or July of 2004, relying on representations made to him and discussed above, Brian Vodicka repeated various representations to Bobby Inman, while Inman was in Austin, Texas. Brian Vodicka repeated to Inman that the DOBI ComfortScan System was the latest thing in breast cancer detection and that it worked and was better than mammography. Brian Vodicka also repeated to Inman that the ComfortScan System was about to be approved by

the FDA and that it was being sold in Europe. Admiral Inman then called Sterling, and Sterling confirmed that each of the representations made by Brian Vodicka were accurate. Relying on the information repeated by Brian Vodicka and confirmed by Sterling, Inman invested in DOBI. The representations were false and misleading. Inman also reasonably relied on the private placement memorandum, which contained numerous material misrepresentations as discussed in much more detail.

    **(12)**    **Erika Boehm**

    119.    In June or July 2004, Brian Vodicka contacted Erika Boehm about DOBI and specifically the ComfortScan System. Ms. Boehm is a breast cancer survivor, who had recently undergone a mastectomy and as such, was acutely attuned to the issue of breast cancer. Brian Vodicka suggested that she contact Harry Datys, with Sterling, about investing in DOBI. While in Miami, Florida, Ms. Boehm contacted Datys and had multiple conversations with him. Datys represented to her that DOBI's ComfortScan System was a major breakthrough in helping to detect breast cancer, because it detected tumors, sooner, smaller, and without any radiation harm to women. Datys represented that it worked and was better than mammography. Datys also represented that the system had obtained its CE Mark in Europe, which meant it had been approved for sale in Europe and had, in fact, been sold in Europe. Datys also said that the system was in its final FDA approval stage and that approval would be obtained shortly. He also stated that DOBI was about to be listed on the American Stock Exchange and that when it went on the AMEX, its stock would sell for between $6.00 - $8.00 per share. Datys played upon Ms. Boehm's own personal trauma and tribulations with breast cancer to convince her that an investment was not only financially wise, but would help advance the fight against breast cancer. Relying upon the representations made by Datys, Boehm invested in DOBI.

### (13)   **Byron Hill**

120.     Byron Hill initially heard about DOBI and its ComfortScan System in the course of his employment with the marketing firm T. Bresner in January or February of 2004.  In the course of  that employment, he met with Phillip Thomas and two people from Strategic Initiatives to develop marketing material for DOBI.  Phillip Thomas told Hill about DOBI's ComfortScan System, which he stated would revolutionize the digital breast imaging industry. Thomas stated to Hill that the ComfortScan System could detect the beginning of breast cancer through angiogenesis.  Thomas further stated that DOBI had studies completed evidencing that the ComfortScan System was able to detect false positives in mammography and was able to detect cancer earlier than mammography.  Additionally, Thomas said that DOBI was trying to raise money to build more systems and to market them both in the United States and internationally.  The representations were false and misleading.

121.     After Hill completed his assignment for DOBI at T. Bresner, he spoke to Brian Vodicka and repeated to Brian Vodicka non-confidential information that Thomas had told him about DOBI and the ComfortScan System.  The representations were false and misleading.

122.     In June of 2004, Brian Vodicka repeated to Hill the statement by Datys that DOBI had sold at least forty machines in India and was in the final approval stages with the FDA.  Immediately after that conversation with Brian Vodicka, Hill contacted Datys to discuss investing in DOBI.

123.     Datys told Hill, while Hill was in California, that the ComfortScan System worked and that it had received approval in the European Union and in Asia.  Datys further stated that DOBI had a distribution agreement in place for a number of machines in India and that they were selling for a good price, somewhere in the $150,000 range.  Datys informed Hill

that the ComfortScan System was better than mammography and that the FDA approval process for the system would be completed in 2005.   Datys also told Hill that the proceeds from the private placement offering would be used for several things:   to provide an inventory of machines; to help market and distribute the machines both in the United States and in international markets; and to help raise DOBI's cash position so that DOBI could be placed on the American Stock Exchange.   Datys told Hill that DOBI should be on the American Stock Exchange in one to two months and that when that happened Hill's shares would be freely tradable and would become more liquid.   Datys further stated that the private placement funds were not needed to help the company get through the FDA approval process but instead would be used to manufacture, market, and distribute the product.   Relying upon the information represented by Datys and Thomas, and repeated by Brian Vodicka, Hill invested in DOBI.   The representations were false and misleading.   Hill also reasonably relied on the private placement memorandum and the DOBI website, including press releases, in making his investment decision.   These contained material misrepresentations as discussed in much more detail.

**(14)** **Heinemann Family Trust, Melvin Solomon, Peter Chase Neumann, Clarice B. Dykema, and William B. Brown**

124.   In July 2004, Peter Schiff, President of EuroPacific Capital, a Newport, California investment firm, acting as an agent for investment purposes for Ken Heinemann and the Heinemann Family Trust, Melvin Solomon, Peter Chase Neumann, Clarice B. Dykema, and William B. Brown, contacted DOBI for information about the company.   Schiff spoke with Jorgensen and Dr. Li.

125.   Both Jorgensen and Li, to support their claim that the ComfortScan would ultimately supplant mammography as a screening process for breast cancer, represented to Schiff:

(a)     The ComfortScan System was a product that worked.

(b)     The system was highly effective.

(c)     It could identify tumors that were far too small to be detected by mammograms.

(d)     Several units had been sold, and far more sales were forthcoming in the immediate future.

126.    Jorgensen represented to Schiff:

(a)     The ComfortScan System had already been approved in many counties as evidenced by its CE Mark, which was offered as proof that the product could be sold in the European Union.

(b)     European sales would be sufficient to sustain profitability until the FDA in the United States gave its approval of the product.

(c)     Dome of the proceeds of the offering would be used to obtain a listing on the American Stock Exchange.

(d)     DOBI would create greater awareness of the ComfortScan among the medical community, and this new awareness would create increased institutional demand.

(e)     The offering in question would "fully fund" DOBI's business plan and that this would be the _final_ capital raised.

(f)     The $2.00 per share exercise price reflected the valuation of a company that was no longer in the speculative phase, but which was entering a more mature, cash flow positive business.

(g)     The proceeds for the Private Placement were only needed to pay for the manufacture of units that were currently sold or probably on order.

(h)     The offering was merely bridge-financing, to allow the company to build more units, in advance of receiving payment.

(i)     The business be self-sustaining, as cash flow from sales would fund the operating costs of the business.

127.    These representations were materially false and the Defendants knew them to be material and false, or made them recklessly.

128.    During June or July of 2005, Schiff, based upon Jorgenson's and Li's representations, recommended investment in DOBI's private placement offering to: Ken Heinemann and the Heinemann Family Trust, while Heinemann was in Green Valley, Arizona; Melvin Solomon, while Solomon was in Mt. Pleasant, South Carolina; Peter Chase Neumann, while Neumann was in Reno, Nevada; Clarice B. Dykema, while Ms. Dykema was in Chicago, Illinois; and William B. Brown while he was in Palos Verdes, California.

129.    In reliance upon Schiff and his due diligence in obtaining information about DOBI and its product, such as the representations described above, and on the information contained in the Private Placement Memorandum, the Heinemann Family Trust, Melvin Solomon, Peter Chase Neumann, Clarice B. Dykema, and William B. Brown, and others, invested in DOBI.

**F.    Misrepresentations in The Private Placement Memorandum, Public Filings, Press Releases and/or on DOBI's Website**

130.    As specifically identified above, certain Plaintiffs also reasonably relied on the private placement memorandum, public filings, press releases and DOBI's website in making their decisions to purchase DOBI stock. The private placement memorandum, public filings, press releases, and DOBI's website included the following misrepresentations.

131.    The Private Placement Memorandum included these misrepresentations:

(a)    Page 3 attempted to portray the ComfortScan System as medically acceptable by stating that DOBI is the angiogenesis leader in the biomedical market.

(b)    Page 4 stated that the "ComfortScan System performed at a sensitivity rate of 93% and a specificity rate of 67%."

(c)    Page 9 stated "Use of proceeds ... to accelerate international sales" and "(1) relates primarily to funding of inventory."

(d)     Page 20 stated, "Devices that comply with the requirements of a relevant directive will be entitled to bear a CE Marking, indicating that the device conforms to the essential requirements of the applicable directive and accordingly can be commercially distributed throughout the European Union."

132.    The Defendants failed to disclose the following which they knew were material facts:

(a)     The ComfortScan had serious, unresolved technical problems.

(b)     DOBI was substantially behind its own schedule on its FDA pre-market submission.

(c)     The $750,000 was going to be spent for advertising that would only benefit an inside group including the Defendants and the Verus affiliates.

(d)     The funds earmarked for Investor Relations and Public Relations efforts would actually be used *only* for Investors Relations.

(e)     All of the escrowed monies were outside the control of the management and Board of Directors and that DOBI did not have the ability to use corporate funds for the benefit of all of the shareholders.

133.    DOBI failed to disclose that Verus was a controlling party, under Section 13(d) of the Securities Exchange Act of 1934.  In the memo dated October 8, 2004, from CEO Phillip Thomas to Robert Machinist, Thomas asserted that:

… as you know, Verus has been through [Defendant] Clarke [a DOBI Board member], urging management to actively promote the company at a time when only shares Verus controlled were available to sell in the market – in effect, pressuring the company to actively promote Verus' interests which in turn, negatively affects all the other stockholders and employees.

134.    DOBI misstated Item 11 – Security Ownership of Beneficial Owners in its 2003 Annual Report by not disclosing Strategic Initiatives (Keith Ebert) and an affiliate, Matrix Partners, as owners.  Moreover, on October 31, 2003, Ebert bought 475,000 shares of Lions Gate through Matrix Partners, a company controlled by him, at $0.85 per share ($403,750) as reported

on a Form 8-K dated October 31, 2003. It appears from later reports that Ebert continued to own these 475,000 shares throughout 2004, although DOBI's 2003 10-KSB reported that he owned no shares at year end, and that DOBI counted the 475,000 shares as part of its public float.

135.    DOBI failed to disclose that Verus was surreptitiously selling at the same time DOBI was promoting the stock through the Rising Star and the Spelman articles in August, 2004.

136.    DOBI failed to disclose the ineffectiveness of its ComfortScan. During a Board of Directors meeting on October 7, 2004, DOBI informed the Board that the ComfortScan failed its *initial* verification. DOBI has never had verified medical evidence to support its claims about the effectiveness of the ComfortScan System.

137.    DOBI failed to disclose true details of its "sales" in India. There was no basis in fact to claim substantial revenue would be received from the sale.

138.    DOBI also failed to disclose material related party transactions. For example, DOBI's September 2004 monthly operating report shows an unbudgeted contribution to the Angiogenesis Foundation for $10,000. The Angiogenesis Foundation is controlled by Defendant board member Dr. Li. A letter from the Angiogenesis Foundation dated August 23, 2004, to Thomas signed by Will Li, M.D., President and Medical Director of the Angiogenesis Foundation.

> It is my pleasure to submit to you this letter proposal for an unrestricted educational grant from DOBI Medical International to the Angiogenesis Foundation to support the Foundation's efforts to educate the public about the role of Angiogenesis and disease and its control in modern medicine. The requested grant of $60,000.00 from DOBI Medical will be used to support such programs developed by our organization to educate the public.

**G.     DOBI and its Individual Officer and Director Defendants Had Actual Knowledge of the Falsity of the Representations Made to Plaintiffs or Made them Recklessly.**

139.    DOBI, and Defendant Officers and Directors Thomas, Jorgensen, Li, Machinist, Puthoff, Sohval, and Clarke had actual knowledge that the many representations made to Plaintiffs in June and July 2004 were not truthful, in particular the representations that: (a) DOBI's ComfortScan worked; (b) the ComfortScan System was currently marketed for sale in international markets; (c) DOBI had sold its devices in international markets; (d) the ComfortScan System's ability to detect tumors in a woman's breast represented a major medical advancement in technology over current mammography, achieving a 96% sensitivity rating and an 86% specificity rating; and (e) the ComfortScan System had the ability to detect tumors in a woman's breast, which far exceeded the accuracy of conventional mammography (e.g. that it could detect a tumor at its 1-1 ½ year stage of development as compared to the mammogram's detection of a tumor at its five year stage of development).  Defendants' actual knowledge or recklessness is evidenced and inferred from many sources.  First, DOBI and Defendant Officers and Directors Thomas, Jorgensen, Li, Machinist, Puthoff, Sohval, and Clarke were fully aware that the ComfortScan did not work and was not a viable commercial product.  A little more than two months after Plaintiffs purchased DOBI securities CEO Phillip Thomas informed the Board of Directors on October 7, 2004 that the ComfortScan failed internal testing and did not meet minimal standards.  CEO Phillip Thomas also informed the Board in a written presentation that the ComfortScan was not a released product.   On information and belief, verified clinical tests that supported DOBI's claim of 96% sensitivity rating and an 86% specificity rating do not exist.

140.    Thomas, Jorgensen, Li, Machinist, Puthoff, Sohval, and Clarke had actual knowledge of the falsity and materiality of the misrepresentations and omissions complained of or made them recklessly.   They each were aware that false and misleading statements and

omissions were being issued regarding DOBI and approved or ratified these statements and omissions.

141.    Brian Vodicka was asked to and accepted a position on the DOBI Board of Directors.  During his service, Brian Vodicka discovered facts that led him to conclude that DOBI and the other Defendants had knowingly or recklessly misrepresented the ComfortScan System and DOBI's financial condition.

142.    Brian Vodicka executed an affidavit in connection with a proceeding filed by DOBI that sought to enjoin him from disclosing his concerns about DOBI's misrepresentations and operations.  In the affidavit, he swore:

> 1.    I am an investor in DOBI and served as a Director on the Board of DOBI from October, 2004 until February, 2005 when I resigned because of my concerns about the way the company was being run.  I believed then and believe now that DOBI was withholding information from its shareholders and investors which a reasonable investor would consider important.  I attempted to get the company to disclose the information and correct the manner in which they were running the company but they refused to do so.
>
> ...
>
> 16.    I went to New York for the first Board meeting on October 7, 2004.
>
> 17.    It was at this time that I was informed by Denis O'Connor, VP of Sales that DOBI "did not have a machine to sell."
>
> 18.    CEO Thomas disclosed the machine _failed_ very minimal standards of 85%/50%, in stark contract to the information presented to me, Mrs. Hearst and other investors.
>
> 19.    Also at this meeting, it was disclosed that the Company was going bankrupt and would be out of money shortly and the machine was not ready for commercial distribution, again in stark contrast to the information provided.
>
> 20.    In this meeting, Chairman Robert Machinist stated the Company is going to be out of money soon.  He stated that DOBI has to have a machine ready for Unterberg Towbin to conduct our next raise.  His plan was to take whatever DOBI had, stamp it version 1.0 and fix it later.

21.   *CEO Phil Thomas told me I could not tell Barbara Hearst anything that I learned about the company even though it was at odds with what she was told in the meetings I attended with her. I did not think it was fair to the investors to be putting their money at risk or to Ms. Hearst to be putting her reputation and the reputation of editors of major publications, on the line based upon misleading information.*

...

24.   *Based upon facts known to me in December, 2004, I requested the Audit Committee to retain its own outside legal counsel to investigate the activities of DOBI.*

25.   *I spoke numerous times with the Chairman of the Audit Committee Brad Baker about our duties as directors of a public company and tried to encourage him to vote for my motion for the audit Committee to engage its own independent outside legal counsel.*

26.   *I sent the Chairman of the Audit Committee Brad Baker a detailed letter Fed Ex dated December 1, 2004 requesting an investigation. At that time I was concerned with the misleading information disseminated in the November 17, 2004 research stock report.*

27.   *I resigned on February 2, 2005.*

143.   Thomas, Jorgensen, Li, Machinist, Puthoff, Sohval, and Clarke each had the power to influence and control the decision-making of DOBI, including the content and dissemination of information to investors, including the Plaintiffs. Each of these Defendnats were provided with, or had unlimited access to, copies of DOBI's monthly operating reports, press releases, public filings, private placement memorandum, and website. Each knew of the false and misleading nature of the representations and had the ability to correct such misrepresentations. Instead, each of the Defendants intended that investors, such as the Plaintiffs, rely on such misrepresentations in deciding to invest in DOBI.

**H.    Falsity of the Representations**

144.    Plaintiffs incorporate by reference the facts and allegations set forth above.

145.    Brian Vodicka was elected to the DOBI board, the audit committee, and the compensation committee months after his initial invitation.  Brian Vodicka attended his first board meeting on October 7, 2004.  This was when Brian Vodicka began to learn the truth about DOBI's machine and its fraudulent marketing and stock manipulation.[5]

**(1)    The effectiveness of the machine was misrepresented.**

146.    The machine does not work.  DOBI, to this day, does not have a diagnostically reliable or accurate breast cancer detection device.  The ComfortScan did not work in the context in which the Defendants stated.  The device does not accurately or consistently detect breast cancer.  The device is clearly not better than or more reliable than mammogram.

147.    On October 6, 2004, the day before Brian Vodicka's first board meeting, he was informed by Denis O'Connor, Vice President of Sales, that DOBI "did not have a machine to sell."

148.    At the board meeting, things got worse:

(a)    Phillip Thomas disclosed the machine *failed* its *initial* verification testing, with results of just 85% sensitivity and 50% specificity, in stark contrast to the information presented to Brian Vodicka and the other investors.

(b)    Chairman Robert Machinist stated that the Company was going to be out of money soon.  He stated that DOBI had to have a machine ready or it would lose its next expected funding through Unterberg Tobin.  He recommended that they take whatever DOBI had, stamp it "version 1.0," and fix it later.

---

[5]    On February 2, 2005, Brian Vodicka resigned from DOBI board because of his concerns about the way the company was being run.  He believed that DOBI was withholding information from its shareholders and investors, which a reasonable investor would consider important.  He attempted to get the company to disclose the information and correct the manner in which it was running the company, but they refused to do so.

     (c)    Phillip Thomas said the ComfortScan Medical Imaging System was not a released product.

149.    The failed *initial* test revealed that the representations that the machine "worked" were false and misleading.

150.    For the same reason, the statements that the ComfortScan was a "major advancement," "was better than mammography," "a better way to pinpoint breast cancer," "a quantum leap in technology," and "worked" were false and misleading. Mammography works; the DOBI machine does not. A device that does not work is not an advancement.

151.    Because the machine failed its *initial* tests, as noted in October 2004, the statements just three months earlier about the sensitivity and specificity could not have been true and could not have had any factual basis. DOBI could not have had valid testing to support its claims about the effectiveness of the ComfortScan System. If this was the "initial" test, there could not have been earlier verification to support any of the representations about the machine's efficacy.

152.    The statement that the ComfortScan had a competitive advantage because it covered the entire breast was false and misleading. In December 2004, Mike Jorgensen admitted to Brian Vodicka that additional work was required on the ComfortScan System, because the images lacked sufficient coverage. DOBI misrepresented that the images gave full coverage, an issue that was important in the earlier failure of a competitor.

153.    The absence of a working product also showed that the representations that DOBI was coming out of the development stage were false and misleading. Without a working product, DOBI necessarily would remain in the development stage or go out of business.

154.    The Paris study that was going to compare the machine favorably to MRI, promised in September 2004, did not support the representations by Thomas and Jorgensen.

Instead, it confirmed that the ComfortScan's specificity was a *failure* compared to MRI, giving false positives in 32% of the cases. Instead of comparing the ComfortScan favorably, the report concluded that "the specificity of the method is to be further evaluated," and "Many parameters need to be further defined and explored in order to achieve a full knowledge of these modality limits."[6]

155.    The statements about other clinical trials were false and misleading. The Defendants represented that there would be clinical trials at twelve to fifteen sites by December 2004. Phillip Thomas, Mike Jorgensen, Denis O'Connor, and Harry Datys presented a map of the globe showing eight to twelve sites where the machine supposedly had ongoing clinical studies. In fact, Brian Vodicka learned at the board meetings that DOBI started clinical trials at only two sites.

156.    In its March 11, 2005, SEC Form 10-KSB, DOBI disclosed that it released "version 1.0" in November 2004 (as Machinist had proposed), but subsequently, in January 2005, "*internal testing by non-physician employees raised concerns about scan acceptance rates, repeatability performance, and overall diagnostic accuracy.*" This was the first public disclosure that the machine did not work, contrary to all the earlier representations.

157.    DOBI did not disclose to the Plaintiff investors prior to their investment, the ineffectiveness of the ComfortScan.

(2)    **DOBI's finances were misrepresented.**

158.    As a director, Brian Vodicka learned that the representations about DOBI's expenses and financial condition were false and misleading. Brian Vodicka discovered at the

---

[6]      Athanasiou A., Vanel D., Balleyguier C., Fournier L., Mathieu M. C., Delaloge S., Dromain C., *Dynamic Optical Breast Imaging: A New Technique to Visualise Breast Vessels: Comparison With Breast MRI and Preliminary Results*, 54 European J. of Radiology 72, 79 (2005).

October 2004 and November 2004 board meetings that the financial projections were untrue, and that the company was broke, again.

159.    Brian Vodicka learned that DOBI's monthly expenses were substantially higher than the $400,000 represented to the Plaintiffs.  This severely affected the company's ability to continue its operations and to meet the represented goals.  Based on the prior quarterly expense reports, the Defendants knew that the amounts of DOBI's monthly and outstanding expenses and knew or should have known these expenses were substantially higher than represented.  The amount spent on routine expenses was so large that the proceeds from the private placement were inadequate to fund going forward with FDA models or to build inventory.

160.    At the October 7, 2004, board meeting, a recap of expenses showed that DOBI had used the funds from the private placement at a rate of $887,000 per month for the most recent three months.  DOBI had issued a press release on July 29, 2004, showing its expected monthly expenses were $575,000 to $600,000.  Similarly, page F-2 of the March 11, 2005, Form 10-KSB showed that DOBI's monthly expenses averaged $579,000 for 2004.

161.    At the October meeting, Robert Machinist disclosed that the company would soon be out of money, which was contrary to all the representations about monthly expenses, and the adequacy of the funding to take DOBI through FDA approval and qualify it for listing on the AMEX.  DOBI's financial condition made it unlikely, if not impossible, for DOBI to have enough cash to qualify for listing on the American Stock Exchange.  Those representations were false and misleading.

162.    The information disclosed at the October meeting showed that as of August 31, 2004, DOBI had only $1.6 million of cash available.  DOBI's budget specified $4.5 million in cash to be on hand, and that is what was represented to the Plaintiffs.  Upon information and

belief, DOBI used the funds invested by the Plaintiffs to pay past due expenses and back salaries, not to build inventory, seek FDA approval, qualify for the AMEX, or market the system.[7] Because the accrued expenses were shown in the monthly financial reports, the Defendant officers and directors knew or should have known that the investment funds, would be used for accrued and current operating expenses, which made the representations about the expected use of funds false and misleading.

163.    Likewise, because there was no viable product, the representations about using the funds to build inventory for international sales were false and misleading.

164.    The representations that the funding from the private placement, together with another $3 million coming in December 2004, would adequately fund the company's operating expenses through the testing needed for FDA approval were false and misleading.   This representation was made repeatedly to the Plaintiffs.  Jorgensen confirmed this at the August 4, 2004, board meeting, as shown by the minutes, and repeated this in a press release the same day.

165.    At the October 2004 meeting, the presentation to the board disclosed that the funding was not adequate, because DOBI needed another $5 million in the next six to eight weeks.[8]

166.    At the November 17, 2004, board meeting Jorgensen retracted his earlier statement, and now said that the expenses were $1.5 million per quarter and that the PMA would cost $800,000 per quarter, which would be in addition, instead of being included.

---

[7]        See footnote 10, *post*.

[8]        The slide also said, "For a variety of reasons our stock is currently taking a beating in the market."  Of course, the main reason was the effect of the massive sale of stock as part of the "pump and dump" scheme DOBI entered into with Verus and others, "with their eyes wide open."

167.    Also at the November meeting David Clarke said the company was insolvent, which was contrary to earlier representations that the last round of funds was more than enough to meet DOBI's expenses through the FDA submission.[9]

168.    DOBI later stated in its March 11, 2005, report at page 6, "WE WILL HAVE TO SECURE ADDITIONAL FINANCING IN 2005 AS WE DO NOT HAVE ADEQUATE CASH TO COMPLETE THE FDA PMA PROCESS AND COMMERCIALIZE OUR COMFORTSCAN SYSTEM."

169.    The Rising Star report had boasted that DOBI had no debt, had $25 million in investment money, and could break even by the end of 2005.  Without a viable product and insufficient funding, these statements could not be true.  In fact, DOBI has never reported any substantial revenues in its SEC filings.  Of course, most of the $25 million was long gone, and now DOBI had burned through the most recent millions, and still was no closer to a viable product.

170.    The lack of a working machine, the excess expenses, and the inadequacy of funding show the falsity of the representations that DOBI was "on track" and "meeting all of its business objectives."  DOBI was not meeting the objectives it disclosed to the Plaintiffs.  However, DOBI was very much on track with its hidden scheme to fraudulently raise funds.[10]

---

[9]      Despite its poor financial condition, on November 17, 2004, DOBI published a "researchstock.com" report continuing to make false and misleading projections about having sufficient funding, like those made in June 2004 – despite the board meeting disclosures that DOBI was broke.

[10]      So where did all the money go?  It appears that most of the funding went pay accrued expenses and salaries.  The monthly reports showed DOBI's accounts payable and accrued expenses increasing to $1.4 million just before the Plaintiffs invested.  That amount dropped to $816,000 the month after.  Without a product to manufacture and sell, DOBI's biggest expense was payroll – in particular, compensation for the executives.  According to DOBI's internal documents, the 2004 salaries for thirty-three positions totaled $3.4 million – with Defendants Thomas, Sohval, Jorgenson, and Puthoff taking a combined $820,000.  Half the positions had salaries at or above $100,000, with three positions at or above $200,000.

(3)     <u>Sales of the machine were misrepresented.</u>

171.     The representations that the machine was currently marketed for sale in international markets and that DOBI had orders for fifty-six units were false and misleading, because the machine did not work.  As noted above, after these representations were made to the Plaintiffs, on October 6, 2004, Denis O'Connor, Vice President of Sales, told Brian Vodicka that DOBI "did not have a machine to sell."

172.     The representation that DOBI sold forty units in India for $5.6 million was false and misleading.  In the June 22, 2004, press release DOBI reported an agreement to sell forty units in India.  DOBI announced, "Our ComfortScan System is now ready for its international commercial launch and we have increasing interest within a number of countries for this product."  This statement was false and misleading because it gave the appearance that the ComfortScan System was commercially marketable.  A reasonable interpretation of this announcement was that the product worked and that there was a market for the product.  Neither was true.  Without a viable product, there could be no commercial sales.

173.     Further, while a "sales" contract existed, the agreement would not generate $5.6 million, because of the same agreement provided that DOBI would rebate or give back to the buyer a substantial portion of the sales price.  On information and belief, the buyer had no enforceable obligation to buy.

174.     Brian Vodicka learned from Denis O'Connor, Vice President of Sales, that the sales in India were a "wash," because DOBI paid UTL of India a set amount of money for every scan, which would substantially erode the purchase price of the machine.  There was no basis to claim substantial revenue would be received from the sale.  DOBI failed to disclose the true details of its "sales" in India.

175.    The falsity of the earlier projections of sales of forty units or fifty-six is also shown by the press release of January 20, 2005, where DOBI reported that it sold only *twelve* units in 2004 and that this was consistent with its projection of shipping *ten to fifteen* units that year.

176.    Likewise, in the March 11, 2005, Form 10-KSB DOBI claimed to have "sold and shipped 12 revenue producing production level ComfortScan *investigational* units to international markets for the purpose of conducting local clinical regulatory and marketing studies."   (Emphasis added).   The fact that these units were merely "investigational" was drastically different from the representations about international sales volume and revenue.

177.    The representation about DOBI escrowing $750,000 to market the device internationally was false and misleading.  The internal financial information available to Brian Vodicka did not show that DOBI reserved or spent funds as represented.  Instead, what the documents show is that DOBI paid $750,000 to Strategic Initiatives as part of the "pump and dump" scheme with Verus, which was used to pay for the fraudulent Rising Star Stocks report and Spelman Report.  Thomas admitted in a memo after the October 7, 2004, meeting that the money was "spent on foolish and irresponsible 'IR/PR' activities in the first 9 months of this year [2004] by Verus and its affiliates."

178.    Brian Vodicka later obtained a copy of DOBI's 2001 investor presentation.  This material was given to Brad Baker when he invested in DOBI.  Brad Baker became a director in 2003 and was still on the board during Brian Vodicka's tenure.  In the 2001 presentation DOBI projected $10 million of sales in 2002, and $35 million in 2003.  DOBI did not have any legitimate sales as of late 2004, based on the financial information Brian Vodicka learned as a director.  DOBI never disclosed that it had missed these projections.

**(4)    Marketability of the machine in Europe was misrepresented.**

179.    The Defendants' representations about the meaning of the CE mark were false and misleading.  The Private Placement Memorandum stated:

> The primary regulatory environment in Europe is that of the European Union, which currently consists of 15 member countries encompassing most of the major countries in Europe, with an additional 10 countries invited become members on May 1, 2004. The European Union has adopted numerous directives and standards regulating the design, manufacturing, clinical trials, labeling, and adverse event reporting for medical devices.  Devices that comply with the requirements of a relevant directive will be entitled to bear a CE Marking, indicating that the device conforms to the essential requirements of the applicable directive and, accordingly, *can be commercially distributed throughout the European Union.*

(Emphasis added).  This language was false and misleading.

180.    The only reason for advertising the CE mark was to give the Plaintiffs the false impression that the machine could be commercially sold and used throughout the European Union.  The Defendants intended for the Plaintiffs to believe, and the Plaintiffs reasonably did believe, that the ComfortScan System had been medically accepted in the European Union and that it was only the overly-bureaucratic nature of the U.S. Food & Drug Administration that kept the system from being used in the United States.  The Defendants making this representation intended, and the Plaintiffs reasonably believed, that a commercial market then existed in the European Union.

181.    On October 6, 2004, Denis O'Connor told Brian Vodicka that the CE mark did not allow sales in the European Union and that regulatory approval from each country's health ministry was required.

182.    Contrary to the Defendants' representations about the CE mark, the mark does not satisfy the requirements in the member countries of the European Union concerning approval of medical devices such as the ComfortScan.  The ComfortScan had not been approved by any

European Union members and could not be commercially marketed in Europe for medical use without such approval. When Defendants made the representations to Plaintiffs, Defendants – in particular DOBI General Counsel Frank Puthoff – knew or should have known the CE mark was not adequate and that more stringent registration and approval requirements had to be satisfied before the DOBI system could be used commercially in the European Union.

       (5)       **Timeliness of FDA approval was misrepresented.**

     183.    The representations about FDA approval being imminent were false and misleading. FDA approval was more than a few months away in the summer of 2004, contrary to the claims by Defendants. DOBI did not have any valid studies it could submit to the FDA to secure approval of its system. DOBI had self-defined its "FDA approval modules 1-5." The requirement for steps one through four were crafted so that DOBI could say to investors that it had completed the first four steps of the FDA approval process, when in fact it had barely begun the real process of securing FDA approval.

     184.    Defendants deliberately chose this language with the intent to give the false impression to investors that the ComfortScan was closer to actual medical use than it was. On information and belief, Defendants Li, Verus, Thomas, Jorgensen, Puthoff, and Sohval have been involved in other ventures that attempted to introduce medical products into the marketplace and were aware of the lengthy FDA approval requirements. Theses Defendants failed to accurately and truthfully disclose the progress towards securing FDA approval. Instead, these Defendants misrepresented that they were close to achieving FDA approval. As of the date of this suit,

December 2005, DOBI still lacks FDA approval for the machine.  Without a working machine, DOBI is unlikely ever to receive FDA approval.[11]

185.    In addition, the 2001 presentation had projected submission to FDA in the second quarter of 2002.  A similar projection in the March 2004 Private Placement Memorandum projected FDA submission by the end of 2004.  The later projection in the Private Placement Memorandum was false or misleading, because of the earlier missed goal.  DOBI missed the earlier testing goal in 2001 and was two and one-half years behind schedule.  These material facts were never disclosed to the investors.

### (6)    **Defendants failed to disclose material information.**

186.    DOBI and the other Defendants were guilty of other false and misleading statements and omissions.

187.    The Defendants failed to disclose the following, which they knew were material facts:

(a)    The $750,000 was going to be spent for advertising which would only benefit an inside group including the Defendants and the Verus affiliates.

(b)    The funds earmarked for Investor Relations and Public Relations efforts would actually be used *only* for Investors Relations.

(c)    All of the escrowed monies were outside the control of the management and Board of Directors and that DOBI did not have the ability to use corporate funds for the benefit of all of the shareholders.

(d)    The ComfortScan had serious, unresolved technical problems.

(e)    DOBI was substantially behind its own schedule on its FDA pre-market submission.

---

[11]    DOBI's August 12, 2005, quarterly report states, "We do not now currently believe that the improvements we made to our software and hardware in connection with the development of Comfort Scan System 2.0 will require reinitiating our PMA clinical trial.  If we had to restart our PMA, our best estimate is that PMA submission to the FDA may be delayed by up to twelve months and possibly longer."

188.    DOBI failed to disclose that Verus was a controlling party under Section 13(d) of the Securities Exchange Act of 1934.  DOBI failed to disclose that Verus was surreptitiously selling at the same time DOBI was promoting the stock through the Rising Star and the Spelman articles in August, 2004.  Defendants' manipulative scheme to defraud investors violated Section 10(b) of the Securities Act of 1934.

189.    DOBI misstated Item 11 – Security Ownership of Beneficial Owners in its 2003 Annual Report by not disclosing Strategic Initiatives (Keith Ebert) and an affiliate, Matrix Partners, as owners.  Moreover, on October 31, 2003, Ebert bought 475,000 shares of Lions Gate through Matrix Partners, a company controlled by him, at $0.85 per share ($403,750) as reported on a Form 8-K dated October 31, 2003.  It appears from later reports that Ebert continued to own these 475,000 shares throughout 2004, although DOBI's 2003 10-KSB reported that he owned no shares at year end, and that DOBI counted the 475,000 shares as part of its public float.

190.    DOBI also failed to disclose a related-party transaction.  DOBI's September 2004 monthly operating report shows an unbudgeted contribution to the Angiogenesis Foundation for $10,000.  The Angiogenesis Foundation is controlled by defendant board member Will Li.  A letter from the Angiogenesis Foundation to Thomas, dated August 23, 2004, was signed by Li as president and medical director of the Angiogenesis Foundation and stated:

> It is my pleasure to submit to you this letter proposal for an unrestricted educational grant from DOBI Medical International to the Angiogenesis Foundation to support the Foundation's efforts to educate the public about the role of Angiogenesis and disease and its control in modern medicine.  The requested grant of $60,000.00 from DOBI Medical will be used to support such programs developed by our organization to educate the public.

I.    **Scienter:  Knowledge of Falsity and Severe Recklessness**

191.    Plaintiffs incorporate by reference the facts and allegations set forth above.  In addition to the facts alleged in the preceding sections, there is additional proof that the Defendants made the misrepresentations knowing they were false or made them recklessly.

192.    In a memo dated October 8, 2004, Phillip Thomas wrote to the board and to Robert Machinist that Verus International Group Limited was major cause of the stock price decline.  After the October 2004 meeting, Thomas admitted:

> Third, *it is now very clear that Verus International has been a major cause of the Company's recent stock price decline by selling shares they control in blocks for significantly lower prices than what is available on the open market.*  Examples you are aware of include the sale of 1,000,000 shares in August to Unterberg Tobin at $1.40 a share when the open market price was over $2.20.  Likewise, Unterberg was recently offered 3,000,000 shares at $.87 (when the open market price was over $1.00) by Andy Merkatz of Verus.  As you have directly heard from representatives of Unterberg, they do not trust or respect Verus and Merkatz and want nothing to do with them, much to the credit of these individuals at Unterberg.
>
> *As you know, Verus International has been thru [Defendant and DOBI Board member] David Clarke, urging Management to actively promote the Company at a time when only shares Verus controlled were available to sell in the market – in effect, pressuring the Company to actively promote Verus's interests which, in turn, negatively affects all the other stockholders and employees.*  While David's spoken judgment is, "that's what all these guys do" – it does not mean we have to actively encourage their self-serving ploys to degrade the market price of our stock, which, of course, can only adversely  affect  the  remaining  shareholders and employees.
> This is even more apparent when viewed in light of the alleged mailing of ~500,000 copies of the "Rising Star" article and the $750,000 of shareholder funds spent on foolish and irresponsible "IR/PR" activities in the first 9 months of this year by Verus and its affiliates.  I have opposed this IR/PR effort from Day One and have consistently said we must stay away from activities that undermine the otherwise outstanding efforts of the Company.  We should continue to build a solid medical device company, with good business practices, and integrity.  *If we do that, the market price of our stock will eventually reflect our true value, not trumped value based on hype from Verus.*

(Emphasis added).

193.    DOBI participated in generating this false and misleading "hype," created the manipulative devices by which Verus and its affiliates could profit by dumping their stock, and never disclosed to the investors the device or the control group behind the scheme.  Plaintiffs were the "other stockholders" who were "negatively affected."  Plaintiffs bought at the trumped up price, not the price that will eventually reflect DOBI's true value, if anny.

194.    DOBI, Thomas, Li, Jorgensen, Puthoff, Sohval,Clarke, Verus, Sterling, and Datys knew or should have known the machine did not work.  The *initial* test results in October 2004 showed the machine failed and had an unacceptable specificity rating.   Thus, when Defendants made the prior representations about the efficacy of the machine, there was no testing to support the representations.  Each of these Defendants who made representations about the efficacy of the machine did so either knowing they had no basis for the statements, or did so recklessly.    Each of these Defendants made, approved, paid for, or authorized these misrepresentations.   In addition, each of the DOBI defendants were present at the investor presentations when these false statements were made, but failed to correct them.  Each of these Defendants repeatedly represented, individually and through DOBI and Sterling that the ComfortScan System outperformed mammograms in the early detection of breast cancer.  Yet the system failed its initial testing and all testing thereafter.  Hence, Defendants lacked a factual basis for representing that the system outperformed mammograms.

195.    Likewise, Thomas and Jorgensen made representations about the Paris study, without any factual basis.  Because the report did not compare the machine favorably to MRI, there was no factual basis to support that representation.  They knew the statement was false or made it recklessly, with the intent to deceive.

196.    The timing of the representations about the start of clinical trials shows those statements were made without a factual basis, so that the speakers either knew the statements were false or made them recklessly.  The statements were made in June and July 2004.  Less than three months later DOBI acknowledged that it had no working machine, and only two sites were started by year end.  These representations lacked any factual basis, so there could not have been a good faith basis to make such predictions.

197.    When the DOBI and Sterling Defendants made representations about DOBI's monthly expenses and the adequacy of its funding, DOBI's financial records showed these representations were false.  DOBI's expenses were much higher, so the funding could not achieve the stated goals and could not establish a reserve to support listing on the AMEX.

198.    The DOBI and Sterling Defendants represented that the company was reserving cash to qualify for listing on the American Stock Exchange.  Before the private placement, DOBI lacked the cash reserves to qualify for listing on the AMEX.  The accrued expenses and monthly expenses showed that DOBI could not reserve the required cash.  This financial information would have been known to, or readily available to, each Defendant who made representations about DOBI's finances.  Therefore, those misrepresentations were made with knowledge they were false, or were made recklessly.  DOBI's corporate officials made public statements that were contrary to information they possessed internally, raising a strong inference that the officials of the company acted with fraudulent intent.  Further, these Defendants knew DOBI was not going to be listed on the American Stock Exchange, because proceeds that were supposed to strengthen DOBI's cash position were quickly depleted.  The known expenses would quickly deplete the funds raised from investors.  This information was known to the DOBI Defendants, Sterling, and Datys who had access to and knowledge of DOBI's expenses and lack of revenues.

199.    The DOBI and Sterling Defendants also fraudulently emphasized international sales as a source of revenue.  These Defendants represented that DOBI had made a $5.6 million sale of forty systems to a company in India.  These Defendants did not disclose that the contract was subject to contingencies and that much of the purchase price was to be rebated or refunded to the buyer.  Contrary to the representations, DOBI did not have a $5.6 million sale of equipment to a company in India; it had a contingent, much smaller sale.  DOBI reserved for the amount of the rebate in its financial statements, but that information was hidden so that only a sophisticated financial analyst could detect the disparity.  These Defendants either knew, or should have known, about the limits in the contract at the time the representations about the sale were made.  There statements were knowingly false, or were made recklessly.

200.    Because DOBI had no working machine, the representations projecting sales of forty units lacked any factual basis and were made either with awareness of the falsity, or recklessly.

201.    The DOBI and Sterling Defendants also represented that it the "CE mark" authorized commercial sale of the device in the European Union.  In fact, the CE mark did not authorize commercial distribution of the ComfortScan System "throughout the European Union." DOBI did not disclose that the device also had to comply with individual regulations of the various member nations of the EU prior to commercial distribution within those countries. Because DOBI was not in compliance with the member nations' laws, the company was not authorized to sell the device "throughout the European Union" as represented in the PPM.

202.    DOBI's General Counsel, Frank Puthoff, was aware that the system could not be marketed within the EU at the time the PPM was distributed to Plaintiffs.  The PPM was signed by Defendants Thomas and Jorgenson.  It was signed on February 18, 2004, by the directors of

the company, including Thomas, Clarke, and Li. By signing such a document, the directors were personally making the representations. Of course, these Defendants knew when DOBI issued the PPM there was not a sufficient factual basis to represent that the CE mark had the characteristics they represented it to have. Because there is no factual basis for the representation, Defendants were necessarily aware that they had no basis to make the representation. They either knew the statements were false, or made the statements recklessly.

203.    The Defendants misrepresented the timeliness of FDA approval. The Defendants knew, or should have known, that DOBI had no valid studies to support submission to the FDA and had no working product. They knew, or should have known, that the funding was not adequate to support operations while FDA approval was sought. They knew, or should have known, that prior presentations predicted deadlines for FDA, which were missed. Based on these facts, the Defendants knew their statements about FDA approval were false, or they made them recklessly.

204.    Other evidence supports a strong inference of intent to deceive, based on the DOBI Defendants' efforts to conceal information.

205.    For example, one study was discontinued because DOBI executives were improperly pressuring the clinic to report false results. Plaintiff Dr. Richard Crowley wrote a letter to the DOBI Board of Directors dated January 7, 2005, informing the Board of a meeting Crowley had with Dr. Iraj Khalkhali. Dr. Khalkhali was in charge of DOBI's clinical testing program at UCLA Harbor Medical Center in California that had been unexpectedly shut down in November 2004. Dr. Crowley wrote:

> *What the doctor went on to tell me about the improprieties of DOBI was shocking and disgusting to say the least. . . . For example, he told me DOBI did not want him to be able to look at the results/images obtained from his study. He said he couldn't believe that. . . . He told me he had a lot of pressure put on him to*

*accomplish his trials in a very short period of time. He said, "I got the impression they had financial pressure and wanted to hurry up the research in a month or so which was impossible to do properly."*

206.    When Brian Vodicka began to learn the truth, DOBI's CEO Phil Thomas told him that he could not tell Barbara Hearst anything he had learned about the company, even though it was at odds with what she was told in the investor meetings.

207.    In December 2004, Brian Vodicka urged the Audit Committee to retain outside legal counsel to investigate the activities of DOBI. The committee would not.

208.    Unable to get proper action by DOBI and its officers and other directors, Brian Vodicka resigned. DOBI further attempted to conceal the truth by suing Brian Vodicka in state court in New York ostensibly to enjoin him from revealing confidential information. Of course, since DOBI does not have a working product, Brian Vodicka had nothing a competitor would care about. The information he has is important to investors and potential investors, to reveal the truth about DOBI, which DOBI desperately wanted to keep hidden.[12]

209.    Verus knew of, engaged in, and exercised control of, the negotiation of the reverse merger between DOBI and Lions Gate. Verus intentionally deceived Plaintiffs by not informing them of Verus's true holdings in DOBI, thereby enticing Plaintiffs to invest in DOBI. This scheme let Verus, through its captive marketing company, Strategic Initiatives, tout that DOBI had received a substantial amount of funding in a recent private placement. This helped generate interest in DOBI, creating a market for DOBI stock that had not existed before. The scheme then permitted Verus and its affiliates to "dump" their DOBI shares in the open market, thereby flooding the market and depressing the price of DOBI's stock.

---

[12]    The New York court order allows the information to be used as attachments to pleadings in the securities fraud litigation in Texas and as attachments to regulatory filings with the Securities & Exchange Commission and the Occupational Safety & Health Administration. Through their attorneys, Brian Vodicka and DOBI agreed that instead of attaching documents to the pleadings, the pleadings may contain excerpts.

210.    Verus also acted with knowledge of the false statements or recklessly.  Verus undertook to pump up the price of the DOBI stock by spreading the false statements detailed above, so that it could then dump the stock at a substantial profit.  The substance of the representations was the same as in statements by DOBI.  Verus did not have any more factual basis for the statements in the Rising Star Report and Spelman report than did DOBI.

211.    Verus failed to disclose itself as a substantial shareholder of DOBI.  Verus made this omission to hide itself from the investing public so that it could surreptitiously control the marketing campaign designed to "pump" DOBI stock so that it could "dump" its shares of stock in a newly created market in order to realize substantial gains for itself.

212.    All Plaintiffs purchased DOBI securities from Sterling Financial.  Sterling is liable for the misrepresentations of its broker, Datys.  Both Datys and Schiff were brokers for Sterling Financial.[13]

213.    Sterling Financial also was the managing underwriter for both private placement offerings.  On information and belief, Sterling Financial examined the financial records of DOBI, the back-up medical documentation on the efficiency of the ComfortScan System, the funding agreement with Verus, the contracts for use of the ComfortScan System, and the research protocol results.  On information and belief, Sterling Financial had the same knowledge of the DOBI Defendants.  The representations attributed to Sterling Financial herein were thus made with knowledge of their falsity or were made recklessly.

214.    Sterling Financial either: (a) did not perform adequate due diligence with respect to DOBI prior to disseminating the Private Placement Memoranda; or (b) purposely withheld

---

[13]    Peter Schiff became a sub-broker of Sterling Financial to sell DOBI stock.

material adverse information about DOBI that a reasonable investor would have found important in deciding rather to purchase and hold rather than sell DOBI securities.

215.    Even if Sterling Financial initially did not actively participate in the fraud, Sterling Financial improperly accepted the word of DOBI's officers and others regarding the financial condition and other material aspects of the business operations and prospects of DOBI, without properly researching and investigating the material facts, or Sterling withheld facts and negative information.

216.    Sterling Financial had a duty to make certain that complete, accurate, and truthful information with respect to the DOBI's operations, financial condition, earnings, and future business prospects.  Sterling Financial knew that in a private placement offering potential DOBI investors would rely upon Sterling Financial's due diligence investigation.

217.    In the course of a proper due diligence investigation, Sterling Financial would have obtained knowledge of the numerous misrepresentations and omissions; or recklessly disregarded and failed to disclose to Plaintiffs and the investing public, material misrepresentations and omissions.

218.    Had Sterling Financial properly conducted due diligence, the private placement would have properly disclosed the facts regarding DOBI.  Plaintiffs would not have subsequently invested in DOBI stock it the appropriate disclosures had been made.

**J.      Causation**

219.    Plaintiffs incorporate by reference the facts and allegations set forth above.

220.    Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated DOBI's stock price and operated as a fraud and deceit on Plaintiffs (i.e., the "pump and dump").  Defendants created this façade by misrepresenting the viability of the

ComfortScan, the company's financial condition, sales, regulatory approval in the U.S. and abroad, and DOBI's future business prospects. Later, however, when Defendant Verus and its friends started dumping the stock in large volumes, DOBI's stock price fell precipitously as the prior artificial inflation started to deflate. As Defendants' fraudulent conduct and representations began to come to light the stock price further plummeted. As a result of their purchases of DOBI stock during the summer 2004 private placement, Plaintiffs and others suffered economic loss, – damages – under the federal securities laws.

221.    During the private placement, Defendants presented a false and misleading picture of DOBI's business and prospects as discussed more fully herein. Thus, instead of truthfully disclosing during the private placement that DOBI's business was not as healthy as represented, Defendants caused DOBI to falsely report the results of the ComfortScan's performance, future business prospects, including sales of the machine and the status of obtaining regulatory approval, here and abroad, as well as the financial solvency of the Company. During the private placement, the Sterling and DOBI defendants repeatedly claimed that the machine worked, that it was approved for use in Europe, that FDA approval was imminent, and that the product was being sold, resulting in revenue to finance further manufacturing and marketing of the product. These false claims, in conjunction with the Verus and DOBI Defendants' fraudulent Investor Relation Campaign, caused and maintained the artificial inflation of DOBI's stock price throughout the private placement until the stock was "dumped" and the truth started to emerge about DOBI.

222.    Had the Defendants disclosed Verus's true holdings in DOBI and the "pump and dump" scheme, Plaintiffs would not have purchased DOBI stock. Further, had the DOBI and Sterling Defendants not misrepresented material facts to Plaintiffs concerning the Comfort Scan

System, the status of FDA approval, the effect of the CE mark in Europe, the alleged sales of the system, and the financial condition of the company, Plaintiffs would not have purchased DOBI stock. As a result, Plaintiffs have been damaged by the loss of their investment in DOBI and by the dramatic decline in the value of DOBI's stock. Further, the omitted information concerning Verus's true holdings in DOBI permitted the Defendants to surreptitiously "pump and dump" DOBI stock to the detriment of Plaintiffs. When Plaintiffs purchased DOBI's stock in the summer 2004 private placement, DOBI's stock was trading in excess of $2.00 per share. When the "dumping" commenced in approximately August 2004, the share price plummeted, and by October the price had fallen to less than $1.00 per share, more than a 50% decline in approximately two months, as Verus and its friends "dumped" millions of shares of the stock, netting a staggering profit over 5,600%.

223.    The "pump and dump" operation was a success, especially for Verus and its friends who earned in excess of 5,600% profits on their initial investments. It was also a success for the DOBI and Sterling Defendants who were able to capitalize on the "pump" by raising millions of dollars from the Plaintiffs and others through the private placement.

224.    Since the inception of the "pump and dump" scheme, the price of DOBI stock rose to a high of almost $3.00 per share, at which point Verus began selling its shares on the "bulletin board" market. After completion of the scheme, and with the revelation to the market that the ComfortScan system did not work, the price of the stock has fallen to about .20¢ per share.

225.    The "pump and dump" scheme employed by the Defendants is a classic example of "market manipulation." In cases of market manipulation, the decline in value of an overpriced security is itself "loss causation." Loss causation in securities fraud is an analog to the tort

concept of proximate causation, "meaning that the damages suffered by Plaintiff must be a foreseeable consequence of any" scheme to defraud. Because the gravamen of Plaintiffs' complaint is that the Defendants, each and every one, manipulated the market to "pump" up the price of DOBI's stock, knowing that they were causing the stock to be overvalued and that the stock price would eventually recede to reflect its actual value, thereby injuring the Plaintiffs – that is loss causation. In short, given the nature of market manipulation cases, pleading that securities were purchased at an artificially inflated price is sufficient to plead loss causation – because it is fair to infer that the inflationary effect must inevitably diminish over time. It is that dissipation – and not the inflation itself – that caused Plaintiffs' losses (In this case it dissipated after Verus and its friends "dumped" the stock and the price continued to fall as the truth emerged about DOBI).

226.    Plaintiffs have established a clear causal connection between the Defendants' "pump and dump" scheme and misrepresentations and Plaintiffs' resulting economic losses.

## V.  CAUSES OF ACTION

### A.    Violation of Section 10(b) of the Exchange Act

227.    Plaintiffs incorporate by reference the facts and allegations as set forth above.

228.    Defendants, violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

229.    Defendants engaged in this manipulative stock scheme (*i.e.* the "pump and dump") to make money at Plaintiffs' expense. Defendants manipulated DOBI's trading volume and share price by allowing select stockholders (Verus and friends) to dump their marketable holdings of DOBI stock at an exorbitant profit of 5,600% when the Plaintiffs were restricted

from selling.  All of the Defendants successfully injected inaccurate information into the market to create a false impression of market activity.

230.    Each Defendant was a primary violator, or co-conspirator, or control person within the meaning of Section 20 of the Exchange Act, as alleged below, and had the power and influence to cause DOBI to engage in the unlawful conduct complained of.  Each of the Defendants were able to and did, directly or indirectly, control contents of DOBI's Private Placement Memorandum, control the conduct of DOBI's business, or control the contents of the various annual and quarterly financial reports, statements, and press releases of DOBI and oral misrepresentations made on the behalf of DOBI.

231.    Each Defendant had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, products, management, projections and forecasts, financial condition, market analyses, and future prospects, and to correct any previously issued statements that had become untrue, so that the market price of the Company's securities would be based on accurate and truthful information.

232.    In committing the wrongful acts alleged in this complaint, all Defendants pursued a conspiracy, common enterprise, or common course of conduct, and acted in concert with and conspired with one another, in furtherance of their common plan, scheme, or design.  During all relevant times, each Defendant initiated a course of conduct with the purpose of obtaining money from the investing public in violation of the anti-fraud provisions of federal and state securities laws by knowingly and purposely deceiving the investing public regarding DOBI's financial condition and future business prospects, thereby artificially inflating the market price of DOBI securities.

233.   The Defendant officers and directors of DOBI, Thomas, Jorgensen, Li, Machinist, Puthoff, Sohval, and Clarke were able to and did control the contents of the various quarterly and annual financial reports, SEC filings, press releases, and research analysis reports of the Company.  Each such officer and director Defendant was provided with copies of DOBI's reports, releases, and filings alleged to have been misleading herein prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or to take action to cause them to be corrected.  Because of their Board membership or executive and managerial positions with DOBI, each Board member and officer had access to adverse non-public information about DOBI's business, finances, and future business prospects that was never disclosed to Plaintiffs.  Defendants took no action to set the record straight.  At the same time they were issuing glowing reports about DOBI's prospects, Verus and friends were engaging in insider trading and dumping DOBI stock to personally profit from the scam.

234.   The Defendants engaged in a conspiracy, common enterprise, or a common course of conduct commencing at least by August 2003, to promote the illusion of DOBI's success and to conceal the adverse facts concerning DOBI's markets, business operations, management, financial condition, future prospects, and, most importantly its Comfort Scan System, so that they could protect their executive positions at DOBI, and the compensation and prestige they obtained thereby.

235.   All named Defendants conspired to artificially inflate the trading volume and the price of DOBI's stock and warrants by manipulating the reported assets and earnings of the Company in false and misleading quarterly reports, annual reports, SEC filings, and press releases and misrepresentations to the public. Such false and misleading statements, reports and filings manipulated, misrepresented, and failed to disclose the true facts regarding DOBI's

revenues, earnings, markets, business, management, financial condition, and future prospects. Each Defendant was a direct and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of.

236.   Each Defendant is sued as a co-conspirator, and the liability of each arises from the fact that each engaged in all or part of the unlawful acts charged herein, in violation of the securities laws and common law.  Each of the Defendants, by acting as described, did so knowingly or in such a reckless or grossly negligent manner as to constitute a fraud and deceit upon DOBI's shareholders.

237.   All named Defendants engaged in a plan, scheme, and unlawful conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud upon Plaintiffs.  Defendants made various untrue statements of material facts and omitted material facts thus misleading Plaintiffs. The purposes and effect of the scheme was to create the illusion of financial stability, profitability, and growth so that the Defendants could retain their positions of prestige and profit, and support the value of the securities owned by them and to induce Plaintiffs to purchase securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, conspiracy and course of conduct, each of the Defendants took the actions set forth in this complaint.

238.   Defendants:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, or course of business and a conspiracy, which operated as a fraud and deceit upon Plaintiffs, in an effort to artificially inflate the price of DOBI stock, in violation of §10(b) of the Exchange Act and Rule 10b-5.  All

Defendants, by acting as described, did so knowingly or in such a severely reckless manner as to constitute a deceit and fraud upon Plaintiffs.

239.    All Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, control the content of the various financial reports, statements, and press releases of DOBI. All Defendants had a duty to promptly disseminate accurate and truthful information with respect to DOBI's operations, financial condition, and earnings so that the price of the Company's stock would be based on truthful and accurate information. All Defendants participated in the wrongdoing complained of to continue the illusion of DOBI's prospects for growth and increased profitability and to conceal the adverse facts concerning DOBI's operations and prospects so that they could protect their executive positions, protect the substantial compensation, and prestige they obtained, and collect significant fees associated with the consummation of the private placement and open market purchases.

240.    The individual Defendants' primary liability arises from the facts set forth above, as well as the following facts: (a) the individual Defendants were high level executives, officers, and directors of DOBI; and (b) the individual Defendants participated in the "pump and dump" scheme as discussed above; or (c) the individual Defendants participated in the dissemination of information to one or more of the Plaintiffs which the Defendant knew was materially false and misleading or recklessly made.

241.    The individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with a reckless disregard for the truth in that they failed to disclose such facts, even though such facts were available to them.    The Defendants' material misrepresentations and omissions were done knowingly or recklessly and for the purpose and effect of concealing DOBI's true operating condition and future business

prospects from the investing public and supporting the artificially inflated price of its stock. As demonstrated by Defendants' false statements, half-truths, and omissions concerning DOBI's business, operations, revenues, and financial condition, Defendants, if they did not have actual knowledge of the misrepresentations alleged, were severely reckless in failing to obtain such knowledge, by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

242. As a result of the dissemination of the false and misleading reports, releases and financial statements, and oral statements the price of the DOBI's stock was artificially inflated throughout the relevant times. Without knowledge of the adverse facts concerning DOBI's business and financial condition concealed by the Defendants, Plaintiffs purchased DOBI's securities at artificially inflated prices, relying upon the integrity of the securities markets and were damaged as a result.

243. Had Plaintiffs known of the materially adverse information they would not have purchased the securities of DOBI.

244. By virtue of the foregoing, each of the Defendants violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**B.    Violation of Section 18(A) of the Exchange Act**

245. Plaintiffs incorporate by reference the facts and allegations set forth above.

246. In violation of Section 18(a) of the Securities Exchange Act, 15 U.S.C. § 78r(a), DOBI made material misrepresentations and omissions in its 10-KSBs and 10-QSBs, which were filed with the SEC. The misrepresentations and omissions contained in the 10-Ks and 10-Qs were repeated in the PPM, and in DOBI's various annual reports and press releases.

247.   Certain Plaintiffs, as specifically identified above, reasonably relied on the representations contained in DOBI's SEC filings, and repeated in the Private Placement Memorandum and annual reports, in deciding to purchase the stock.

248.   As a result of DOBI's misrepresentations and omissions, the Plaintiffs purchased stock at an inflated value.  Had Defendants not made such misrepresentations and omissions in DOBI's 10-KSBs and 10-QSBs, and not repeated the misrepresentations and omissions in the Private Placement Memorandum, Plaintiffs would not have purchased the stock.

249.   As a direct and proximate result of the material misrepresentations and omissions made by Defendants, Plaintiffs suffered damages.

### C.   Violations of Section 20(a) of the Exchange Act

250.   Plaintiffs incorporate by reference the facts and allegations as set forth above.

251.   Robert Machinist, Phillip Thomas, Will Li, Mike Jorgensen, Frank Puthoff, Robert Sohval, David Clarke, and Verus were control persons within the scope of Section 20 of the Exchange Act, as they each had the power to influence and control and did influence and control, directly or indirectly, the decision-making of DOBI, including the undertaking of the "pump and dump" scheme and the dissemination of false statements to the investing public – particularly to the Plaintiffs.

252.   These individual Defendants were provided with, or had unlimited access to, copies of DOBI's press releases, public filings, private placement memorandum, and other statements alleged by Plaintiffs to be false or misleading prior to, or shortly after, the time these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  These individual defendants had direct and supervisory involvement in the day-to-day operations of DOBI and therefore, are presumed to have had the power to

control or influence the particular acts giving rise to the securities violations alleged in this complaint, and exercised that power. These individual defendants controlled DOBI and its employees.

253.    By virtue of their positions as controlling persons, the listed Defendants are liable pursuant to Section 20 of the Exchange Act. As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of DOBI's securities.

### D.    Violations of Texas Securities Act and Business & Commerce Act

254.    Plaintiffs incorporate by reference the facts and allegations set forth above.

255.    Defendants are liable to the Texas Plaintiffs for violations of the Texas Securities Act, Tex. Rev. Civ. Stat. Ann. article 581-1, *et seq.,* and in particular article 581-33 of the Texas Securities Act for purchases made by the Texas Plaintiffs. All named Defendants violated, conspired to violate, or aided and abetted violations of article 581-33 by making untrue statements of material facts or omitting to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

256.    Defendants' public pronouncements and filings materially misrepresented or failed to disclose numerous material facts.

257.    By reason of their conduct and omissions, Defendants violated, aided, abetted, or controlled another who violated article 581-33 of the Texas Securities Act, and the Defendants are jointly and severally liable to the Texas Plaintiffs.

258.    Defendants also violated and are liable to the Texas Plaintiffs pursuant to section 27.01 of the Texas Business & Commerce Code ("Fraud in Real Estate and Stock Transactions").

259.    Defendants violated, conspired to violate, aided, or abetted violations of Section 27.01 of the Texas Business & Commerce Code by making false representations of past or existing material facts or omitting to state past or existing material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

260.    The false representations were made for the purpose of inducing Plaintiffs to enter into contracts for the purchase of the DOBI securities.   The false representations were relied upon by Plaintiffs.

261.    As a result of Defendants' misconduct, which violated both the Texas Securities Act and section 27.01 of the Texas Business & Commerce Code, the Texas Plaintiffs suffered substantial damages.

E.    **Violations of Florida Securities and Investor Protection Act**

262.    Plaintiffs incorporate by reference the facts and allegations set forth above.

263.    Defendants are liable to Florida Plaintiff Erika Boehm for violations of the Florida Securities and Investor Protection Act Chapter 517, Fla. Stat. F.S.A., *et seq*.   All named Defendants violated, conspired to violate, or aided and abetted violations of Chapter 517 by making untrue statements of material facts or omitting to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

264.    Defendants' public pronouncements and filings materially misrepresented or failed to disclose numerous material facts.

265.    By reason of their conduct and omissions, Defendants violated, aided, abetted, or controlled another who violated Chapter 517 of the Florida Securities and Investor Protection Act, and the Defendants are jointly and severally liable to Boehm.

266.    As a result of Defendants' misconduct, Boehm suffered substantial damages.

**F.**    **Violations of Pennsylvania Securities Act of 1972**

267.    Plaintiffs incorporate by reference the facts and allegations set forth above.

268.    Defendants are liable to Pennsylvania Plaintiff Keith Harris for violations of the Pennsylvania Securities Act of 1972, Title 70.   All named Defendants violated, conspired to violate, or aided and abetted violations of Title 70 by making untrue statements of material facts or omitting to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

269.    Defendants' public pronouncements and filings materially misrepresented or failed to disclose numerous material facts.

270.    By reason of their conduct and omissions, Defendants violated, aided, abetted, or controlled another who violated Title 70 of the Pennsylvania Securities Act of 1972, and the Defendants are jointly and severally liable to Harris.

271.    As a result of Defendants' misconduct, Harris suffered substantial damages.

**G.**    **Violations of Illinois Securities Law of 1955**

272.    Plaintiffs incorporate by reference the facts and allegations set forth above.

273.    Defendants are liable to Illinois Plaintiff Clarice Dykema for violations of the Illinois Securities Act of 1955 (ISL) 815 Ill. Comp. Stat. 5/1, *et seq*.   All named Defendants violated, conspired to violate, or aided and abetted violations of the Securities Act by making untrue statements of material facts or omitting to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

274.    Defendants' public pronouncements and filings materially misrepresented or failed to disclose numerous material facts.

275.    By reason of their conduct and omissions, Defendants violated, aided, abetted, or controlled another who violated the Illinois Securities Act of 1955, and the Defendants are jointly and severally liable to Dykema.

276.    As a result of Defendants' misconduct, Dykema suffered substantial damages.

**H.    Violations of California Corporate Securities Law of 1968**

277.    Plaintiffs incorporate by reference the facts and allegations set forth above.

278.    Defendants are liable to California Plaintiffs Crowley, Hill, and Brown for violations of the California Corporate Securities Law of 1968, Cal. Corp. Code section 25000, *et seq*.   All named Defendants violated, conspired to violate, or aided and abetted violations of section 25000, *et seq.* by making untrue statements of material facts or omitting to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

279.    Defendants' public pronouncements and filings materially misrepresented or failed to disclose numerous material facts.

280.    By reason of their conduct and omissions, Defendants violated, aided, abetted, or controlled another who violated section 25000, *et seq.,* of the California Corporate Securities Law of 1961, and the Defendants are jointly and severally liable to Crowley, Hill, and Brown.

281.    As a result of Defendants' misconduct, Crowley, Hill, and Brown suffered substantial damages.

**I.    Violations of Arizona Securities Act**

282.    Plaintiffs incorporate by reference the facts and allegations set forth above.

283.    Defendants are liable to the Heinemann Family Trust for violations of the Arizona Securities Act, Ariz. Rev. Stat. section 44.1801, *et seq*.   All named Defendants violated,

conspired to violate, or aided and abetted violations of the Arizona Securities Act by making untrue statements of material facts or omitting to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

284.    Defendants' public pronouncements and filings materially misrepresented or failed to disclose numerous material facts.

285.    By reason of their conduct and omissions, Defendants violated, aided, abetted, or controlled another who violated the Arizona Securities Act, and the Defendants are jointly and severally liable to the Heinemann Family Trust.

286.    As a result of Defendants' misconduct, The Heinemann Family Trust suffered substantial damages.

**J.    Violations of South Carolina Uniform Securities Act**

287.    Plaintiffs incorporate by reference the facts and allegations set forth above.

288.    Defendants are liable to South Carolina Plaintiff Melvin Solomon for violations of the South Carolina Uniform Securities Act, S.C. Code Ann. section 35, *et seq*.   All named Defendants violated, conspired to violate, or aided and abetted violations of South Carolina Blue Sky Law by making untrue statements of material facts or omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

289.    Defendants' public pronouncements and filings materially misrepresented or failed to disclose numerous material facts.

290.    By reason of their conduct and omissions, Defendants violated, aided, abetted, or controlled another who violated the South Carolina Uniform Securities Act, and the Defendants are jointly and severally liable to Solomon.

291.    As a result of Defendants' misconduct, Solomon suffered substantial damages.

**K.      Violations of Nevada Uniform Securities Act**

292.    Plaintiffs incorporate by reference the facts and allegations set forth above.

293.    Defendants are liable to Peter Chase Neumann for violation of the Nevada Uniform Securities Act, N.R.S. 90.211, *et seq*.  All named Defendants violated, conspired to violate, or aided and abetted violations of the Nevada Uniform Securities Act by making an untrue statement of a material fact or omitting to state a material fact necessary to make the statements made not misleading in light of the circumstances under which they are made or engaging in an act, practice or course of business which operated as a fraud or deceit upon all Plaintiffs, including Neumann.

294.    Defendants' public pronouncements and filings materially misrepresented or failed to disclose numerous material facts.

295.    By reason of their conduct and omissions, Defendants violated, aided, abetted, or controlled another who violated the Nevada Uniform Securities Act and the Defendants are jointly and severally liable to Neumann.

296.    As a result of Defendants' misconduct, Neumann suffered substantial damages.

**L.      Fraud and Breach of Fiduciary Duty**

297.    Plaintiffs incorporate by reference the facts and allegations set forth above.

298.    All Defendants are liable to Plaintiffs for common law fraud – including fraud in the inducement, fraud in the transaction, conspiracy to defraud, aiding and abetting a fraud, and fraudulent concealment.  All Defendants engaged in fraud by employing devices, schemes, conspiracies, and artifices to defraud by making untrue statements of material facts or omitting to state material facts necessary to make the statements made in light of the circumstances under

which they were made, not misleading; or by engaging in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs in connection with their purchases of DOBI securities.

299.    In particular, Defendants employed SEC filings, Private Placement Memoranda misrepresentations and omissions of material facts, and recommendations to investors as devices to commit fraud.  The statements in their SEC filings and PPM were untrue and omitted material facts necessary to make the statements in the SEC filings and private placement memorandum true.    By directing and promulgating false statements to Plaintiffs and other investors, Defendants embarked upon a course of business that operated as a fraud and deceit upon Plaintiffs.

300.    Defendants knew or recklessly disregarded the fact that the complained of acts and practices, misleading statements, and omissions would adversely affect the integrity of the market for DOBI securities, including debts instruments, and would artificially inflate or maintain the price of such securities.  Had the adverse facts that Defendants concealed been disclosed, the sale of, and market for, DOBI securities would not have been possible at the time that Plaintiffs purchased the DOBI securities.  Further, had the adverse facts been later disclosed, Plaintiffs would have sold, rather than held, DOBI securities in their portfolios.

301.    All Defendants conspired with, and aided and abetted, DOBI.  Defendants agreed upon a common course of action aimed at falsifying DOBI's reported financial condition by numerous acts.  By their conduct, Defendants breached their fiduciary duty to the stockholder Plaintiffs.

302.    All Defendants, furthermore, continued to fraudulently conceal from Plaintiffs the true facts.  In particular, even if Defendants make the unreasonable argument that they did

not know that the statements were false when made, Defendants unquestionably knew the statements to be false at the time Plaintiffs purchased DOBI securities.

303.    Because of Defendants' fraudulent concealment of material facts, Plaintiffs purchased DOBI securities and were unaware that DOBI securities already in their portfolio should have been sold.

304.    Without knowledge of the false and misleading nature of Defendants' various representations and omissions, Plaintiffs relied, to their detriment, on Defendants' representations.

305.    The value of the securities purchased by Plaintiffs declined materially because of the misrepresentations and concealment of material facts.

306.    Plaintiffs suffered substantial harm as a result of Defendants' fraudulent conduct and are entitled to damages and equitable relief.

## M.    **Indemnification**

307.    Brian Vodicka was a director of DOBI from October 2004 until he resigned in February 2005 because of DOBI's failure to remedy its fraudulent activities.    Instead of correcting the problems, DOBI sued Brian Vodicka in New York state court seeking to enjoin him from disclosing DOBI information.    Brian Vodicka has incurred fees and expenses in the defense of that case.    Brian Vodicka is entitled to indemnification from DOBI for his fees and expenses.    Article 10 of DOBI's Certificate of Incorporation expressly provides that DOBI will indemnify to the fullest extent allowed by law any person who is made a party to any proceeding by reason of the fact that he was a director.    This indemnification includes reasonable expenses, including attorney's fees.

308.    Likewise, Brian Vodicka is entitled to indemnification under article 6 of DOBI's Bylaws, which provides that DOBI will indemnify to the fullest extent allowed by law any person who is made a party to any proceeding by reason of the fact that he was a director.  This indemnification includes reasonable expenses, including attorney's fees.

309.    Because these are contract claims, Brian Vodicka is also entitled to recover his reasonable attorney's fees under Tex. Civ. Prac. & Rem. Code section 38.001.

## VI. CONCLUSION

310.    As a result of Defendants' wrongful conduct, Plaintiffs suffered substantial harm and are entitled to actual damages and equitable relief.  Plaintiffs are also entitled to special damages.  As part of their actual damages, Plaintiffs are entitled to reasonable and necessary attorneys' fees, expert witness fees, cost for copies of depositions, and court costs.

311.    In addition to actual damages, Plaintiffs are entitled to recover punitive damages. All named Defendants' conduct was done fraudulently, knowingly, with actual awareness, malice and intent, or with such an entire want of care as to indicate that the acts and omissions in question were the result of conscious indifference to the rights, welfare, or safety of the persons affected by them, including Plaintiffs, such that Plaintiffs are entitled to an award of exemplary or punitive damages, to be determined by the jury commensurate with the facts of this case.

312.    Plaintiffs are entitled to prejudgment and postjudgment interest on their damages as provided by law.

313.    Nothing Plaintiffs did or failed to do contributed to the damages sustained or affected the equitable relief to which they are entitled.

314.    Suit was timely instituted.  All conditions necessary, if any, for the bringing of this suit or the recovery of damages have occurred or will have occurred prior to judgment.

## VII.  <u>PRAYER FOR JUDGMENT AND RELIEF</u>

Plaintiffs pray for judgment in their favor and an award of:

1.      Compensatory damages against Defendants individually, jointly, and severally.

2.      Prejudgment  and postjudgment interest.

3.      Punitive damages.

4.      Disgorgement of Defendants' profits and commissions.

5.      Costs, disbursements, and reasonable allowances for Plaintiffs' counsels' and experts' fees and expenses.

6.      Attorneys' fees.

7.      Restitution, rescission, and disgorgement as permitted by law.

8.      Costs of Court.

9.      All such other and further relief at law or in equity to which Plaintiffs are entitled.

## VIII.  <u>JURY TRIAL DEMAND</u>

Plaintiffs demand a jury trial pursuant to Federal Rule of Civil Procedure Rule 38(b).

Respectfully submitted,

Joseph F. Brophy
State Bar No. 00787146
Alice London
State Bar No. 15292000

BISHOP LONDON BROPHY DODDS
106 East 6th Street, Suite 700
Austin, Texas  78701
(512) 479-5900; (512) 479-5934 *facsimile*

ATTORNEYS FOR PLAINTIFFS

BETSEY AUBREY, STEVE AUBREY
ERIKA BOEHM, WILLIAM B. BROWN,
RICHARD CROWLEY, CLARICE DYKEMA,
ROBERT EMERSON, M. RUSSELL
GREGORY, KEITH HARRIS, BARBARA
HEARST, HEINEMANN FAMILY TRUST,
BYRON HILL, BOBBY R. INMAN,
WILLIAM JONES,  MELVIN SOLOMON,
PETER CHASE NEUMANN, VODICKA
FAMILY TRUST, GARY VODICKA, HELEN
VODICKA, ALTON WHITE

Mark L. Kincaid
State Bar No. 11431300

KINCAID, HORTON & SMITH
106 East 6th Street, Ste. 500
Austin, Texas 78701
(512) 499-0999; (512) 499-0816 *facsimile*

ATTORNEYS FOR BRIAN VODICKA